**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | |
|---|---|
| CHIP HUNT; REPUBLICAN PARTY OF TEXAS, | |
| *Plaintiffs*, | |
| v. | Case No. 2:25-cv-200 |
| STATE OF TEXAS; JANE NELSON, in her official capacity as Texas Secretary of State, | |
| *Defendants*. | |

**BRIEF IN SUPPORT OF DEFENDANT SECRETARY OF STATE
JANE NELSON'S MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

STATEMENT OF THE CASE.................................................................................3

      A.     Legal Background ................................................................. 3

      B.     Procedural Background.......................................................... 5

LEGAL STANDARD .............................................................................................6

ARGUMENT ..........................................................................................................6

    I.     This Court Lacks Jurisdiction Over The Party's Lawsuit...................... 6

      A.     The Court Should Dismiss the Entire Action for Lack of
             Jurisdiction................................................................... 7

      B.     The State of Texas Is Immune From Suit ................................ 14

      C.     Chip Hunt Lacks Standing to Bring a First Amendment Challenge........ 16

    II.    The Complaint Fails To State A Claim................................................ 16

      A.     The Election Code Does Not Severely Burden the Party's
             Associational Rights ...................................................... 16

      B.     The Election Code Survives Constitutional Scrutiny ............................. 23

CONCLUSION......................................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Alden v. Maine,*
   527 U.S. 706 (1999) ........................................................................................ 14

*Am. Party of Tex. v. White,*
   415 U.S. 767 (1974) .......................................................................................... 3

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) .......................................................................................... 6

*Barber v. Bryant,*
   860 F.3d 345 (5th Cir. 2017) ............................................................................ 7

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) .......................................................................................... 6

*Benfield v. Magee,*
   945 F.3d 333 (5th Cir. 2019) ............................................................................ 6

*Brockett v. Spokane Arcades, Inc.,*
   472 U.S. 491 (1985) .......................................................................................... 7

*Cal. Democratic Party v. Jones,*
   530 U.S. 567 (2000) ................................................................................... *passim*

*Carney v. Adams,*
   592 U.S. 53 (2020) ............................................................................................ 7

*Clingman v. Beaver,*
   544 U.S. 581 (2005) ................................................................................... *passim*

*Coleman v. Lincoln Parish Det. Ctr.,*
   858 F.3d 307 (5th Cir. 2017) .......................................................................... 21

*Crawford v. Marion Cnty. Election Bd.,*
   553 U.S. 181 (2008) ........................................................................................ 25

*Democratic Party of Haw. v. Nago,*
   833 F.3d 1119 (9th Cir. 2016) ........................................................................ 22

*Democratic Party of U.S. v. Wisconsin ex rel. La Follette,*
   450 U.S. 107 (1981) ............................................................................... 1, 10, 24

*Dep't of Pub. Safety v. Great S.W. Warehouses,*
   352 S.W.2d 493 (Tex. Civ. App. 1961) .......................................................... 15

*DM Arbor Ct., Ltd. v. City of Houston*,
    988 F.3d 215 (5th Cir. 2021) ................................................................ 11

*Franchise Tax Bd. v. Hyatt*,
    587 U.S. 230 (2019)............................................................................ 14

*Hillman v. Nueces County*,
    579 S.W.3d 354 (Tex. 2019).................................................................. 14

*Houston Chron. Pub. Co. v. City of League City*,
    488 F.3d 613 (5th Cir. 2007) .................................................................. 7

*Idaho Republican Party v. Ysursa*,
    765 F.Supp.2d 1266 (D. Idaho 2011) ..................................................... 10

*Ill. State Bd. of Elections v. Socialist Workers Party*,
    440 U.S. 173 (1979)............................................................................ 24

*Inst. for Free Speech v. Johnson*,
    148 F.4th 318 (5th Cir. 2025) ............................................................... 11

*Lopez v. City of Houston*,
    617 F.3d 336 (5th Cir. 2010) ................................................................ 11

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)............................................................................ 16

*Magnolia Venture Cap. Corp. v. Prudential Secs., Inc.*,
    151 F.3d 439 (5th Cir. 1998) ................................................................ 14

*Miller v. Cunningham*,
    512 F.3d 98 (4th Cir. 2007) ...................................................... 13, 20, 24

*Miss. State Democratic Party v. Barbour*,
    529 F.3d 538 (5th Cir. 2008) ......................................... 9, 10, 11, 14

*N.Y. State Bd. of Elections v. Lopez Torres*,
    552 U.S. 196 (2008)............................................................................. 4

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
    538 U.S. 803 (2003)............................................................................ 13

*P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*,
    506 U.S. 139 (1993)............................................................................ 14

*PennEast Pipeline Co., LLC v. New Jersey*,
    594 U.S. 482 (2021)............................................................................ 14

*Perez v. Region 20 Educ. Serv. Ctr.*,
    307 F.3d 318 (5th Cir. 2002) ................................................................. 15

*Prestage Farms, Inc. v. Bd. of Supervisors*,
    205 F.3d 265 (5th Cir. 2000) ................................................................. 9

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006).................................................................................. 12

*Reynolds v. Sims*,
    377 U.S. 533 (1964)............................................................................. 24

*Roark & Hardee LP v. City of Austin*,
    522 F.3d 533 (5th Cir. 2008) ................................................................. 13

*Smith v. Allwright*,
    321 U.S. 649 (1944)............................................................................. 3

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)............................................................................. 16

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009)............................................................................. 7

*Tashjian v. Republican Party of Conn.*,
    479 U.S. 208 (1986)................................................................. 1, 4, 19, 23

*Tex. Dep't of Corrections v. Herring*,
    513 S.W.2d 6 (Tex. 1974)..................................................................... 15

*Texas v. United States*,
    497 F.3d 491 (5th Cir. 2007) ................................................................. 11

*Timmons v. Twin Cities Area New Party*,
    520 U.S. 351 (1997)................................................................. 3, 16, 17, 25

*United States v. Classic*,
    313 U.S. 299 (1941)............................................................................. 24

*Walmart, Inc. v. U.S. Dep't of Justice*,
    21 F.4th 300 (5th Cir. 2021) ................................................................. 11

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008)....................................................................... 14, 21

*Wesberry v. Sanders*,
    376 U.S. 1 (1964).................................................................................. 24

*Yick Wo v. Hopkins*,
  118 U.S. 356 (1886) ................................................................... 24

**Constitutional Provisions**

U.S. Const. art. I, §4, cl. 1 ........................................................... 3

U.S. Const. art. III, §2 ................................................................. 7

**Statutes**

Tex. Elec. Code §31.001 ............................................................. 3

Tex. Elec. Code §31.171 ............................................................. 3

Tex. Elec. Code §32.002 ........................................................... 18

Tex. Elec. Code §32.006 ........................................................... 18

Tex. Elec. Code §162.001 ..................................................... 4, 17

Tex. Elec. Code §162.003 ................................................. 4, 17, 19

Tex. Elec. Code §162.004 ..................................................... 4, 18

Tex. Elec. Code §162.005 ........................................................... 18

Tex. Elec. Code §162.006 ........................................................... 17

Tex. Elec. Code §162.007 ..................................................... 17, 19

Tex. Elec. Code §162.008 ..................................................... 4, 19

Tex. Elec. Code §162.009 ............................................................. 4

Tex. Elec. Code §162.010 ............................................................. 4

Tex. Elec. Code §162.012 ................................................. 4, 17, 21

Tex. Elec. Code §162.013 ........................................................... 17

Tex. Elec. Code §162.014 ............................................. 4, 17, 19, 25

Tex. Elec. Code §162.015 ........................................................... 17

Tex. Elec. Code §172.001 ............................................................. 3

Tex. Elec. Code §172.026 ........................................................... 18

Tex. Elec. Code §172.111 ............................................................. 3

Tex. Elec. Code §172.130 ................................................................................................ 3

Tex. Elec. Code §172.115 .............................................................................................. 18

Tex. Elec. Code §173.001 ................................................................................................ 3

Tex. Elec. Code §173.088 ................................................................................................ 3

Tex. Elec. Code §276.019 ................................................................................................ 5

Tex. Gov't Code §402.004 .............................................................................................. 15

**Rules**

Fed. R. Civ. P. 12 ........................................................................................................... 6

**Other Authorities**

Br. of Appellee Glenn Hegar, Texas Comptroller of Public Accounts,
  *Hines v. Hegar*, No. 10-20-00220-CV
  (Tex. Ct. App. Sept. 24, 2021), 2021 WL 5539873 .............................................. 15

O. Douglas Weeks,
  *A Comprehensive History of Texas Election Laws*,
  Tex. State Historical Ass'n (2016), https://perma.cc/3UYH-ZMV4 ....................... 4

Pet'r's Br. on the Merits,
  *Berry v. Tarrant Cnty. Democratic Party*,
  No. 14-0470 (Tex. Jan. 21, 2015), 2015 WL 333304 ............................................. 15

Press Release,
  *Texas GOP Moves to Protect Primary Elections from Outside Interference,
  Republican Party of Texas* (June 16, 2025),
  https://perma.cc/3U2L-98SD ................................................................................. 13

Reply Br. of Appellants/Response Br. of Cross-Appellees
  State of Texas & Governor George W. Bush,
  *In re Priv. Couns. Agreement*,
  Nos. 00-40024, 00-40036, 00-40038 (5th Cir. May 24, 2000), 2000 WL 34216058 ............. 16

Resp'ts' Br. on the Merits,
  *My-Tech, Inc. v. Univ. of N. Tex. Health Sci. Ctr.*,
  No. 05-0590 (Tex. Jan. 18, 2006), 2006 WL 272713 ............................................. 15

Tex. Sec'y of State,
  *Party Affiliation*, https://perma.cc/B6UP-XRTC .................................................. 18

## INTRODUCTION

For over 70 years, Texas has required political parties to nominate candidates through primary elections.  Contrary to the Plaintiffs' suggestions, Texas does not open primary elections to any and all voters regardless of party affiliation.  A voter must affiliate with a political party before participating in a party's primary, either before or on the day of the election.  That affiliation has consequences; it binds the voter for the rest of the voting year, and it prohibits the voter from voting in another party's primary or runoff election, participating in another party's affairs, or running as an independent candidate in the general election if the party has a nominee for that office.  Nor can anyone who signed a petition for a party's primary candidate vote in another party's primary.  By requiring voters to affiliate with a political party before voting in the party's primary while permitting voters to affiliate the day of the election, the Texas primary system strikes a balance between protecting a party's associational rights, ensuring that elections are administrable, and safeguarding the fundamental right to vote.  After all, requiring voters to register with a party well before the election not only would require massive changes to the State's voter registration apparatus and impose massive administrability costs on multiple agencies, but would also foreclose voters who newly (but sincerely) identify with a political party from voting in its primary.

Given those competing interests, it is hardly surprising that the Supreme Court has never suggested that open or semi-open primaries raise constitutional concerns.  To the contrary, it has repeatedly suggested that "the relative merits of closed and open primaries" are for each state to consider.  *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 222 (1986); *see also Democratic Party of U.S. v. Wisconsin ex rel. La Follette*, 450 U.S. 107, 121 (1981); *Cal. Democratic Party v. Jones*, 530 U.S. 567, 577 n.8 (2000).  The Texas Legislature has done so here, and the Secretary of State is duty-bound to abide by that determination.

1

In recent years, some members of the Republican Party of Texas have expressed concern that the State's affiliation requirements are not restrictive enough. In the lead up to the March 2026 primary elections, those members demanded action. After efforts to convince the state legislature to amend the Election Code failed, the Plaintiffs filed this lawsuit. The Plaintiffs named the State of Texas as a defendant in a transparent attempt to obtain a sham judgment, and the State filed a joint motion for entry of a consent judgment declaring the Texas primary system unlawful.

That thinly disguised attempt to impose by judicial fiat what the Plaintiffs could not achieve via legislation lays bare that this lawsuit does not belong in the federal courts. Indeed, Plaintiffs ask the Court to constitutionalize an ongoing debate about open primaries—one that is up to the Texas Legislature to resolve—and to upend longstanding election machinery based on a hypothetical associational burden that may never materialize. The Plaintiffs ask this Court to declare Texas' open-primary framework unconstitutional *now*—before the Party has adopted a permanent rule closing its primaries, before the Party has decided what a closed primary would look like, and before any concrete dispute exists about how a closed primary would be administered (by the Party and election officials across the State).

That haphazard attack on the Election Code would not even accomplish the Party's stated goal of closing its primaries. The State's open-primary regime is governed by dozens of provisions spread through the Election Code—many of which the Plaintiffs do not challenge—and is administered by thousands of entities and officials that are not defendants in this action. The Party wants the Court to set those rules aside (but only as to the Party) so that the Party (or perhaps the legislature) can write its own, as-yet unspecified set of bespoke rules. That approach would create a patchwork of election rules that vary from one political party to another. Needless to say, such a regime would be extraordinarily difficult for the relevant election officials to administer.

Article III does not permit the Court to wade into this premature dispute—and even if it did, the First Amendment does not prohibit Texas' longstanding open-primary approach. The Court should grant Secretary of State Jane Nelson's motion to dismiss.

## STATEMENT OF THE CASE

### A.    Legal Background

States have broad authority to regulate elections. For federal elections, the U.S. Constitution grants States the "power to prescribe the 'Times, Places and Manner of holding Elections for Senators and Representatives.'" *Clingman v. Beaver*, 544 U.S. 581, 586 (2005) (plurality opinion) (quoting U.S. Const. art. I, §4, cl. 1). States likewise "control … the election process for state offices" by virtue of their sovereign authority to regulate state affairs. *See id.* Because our constitutional structure vests states with authority over state and federal elections, states "inevitably must[] enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997).

The State of Texas exercised that broad authority to establish "a detailed statutory scheme … regulating the conduct of political parties as it relates to qualifying for participation in the electoral process." *Am. Party of Tex. v. White*, 415 U.S. 767, 772 (1974). Texas requires political parties to nominate candidates through primary elections "if the party's nominee for governor in the most recent gubernatorial general election received 20 percent or more of the total number of votes received by all candidates for governor in the election." Tex. Elec. Code §172.001. Those primary elections are not purely private affairs; they are funded by taxpayer dollars, *see id.* §§173.001-173.088, they are overseen by state and local election officials, *see id.* §§31.001-31.171, they are subject to extensive state regulation, *see id.* §§172.111-172.130, and they involve state action, *see Smith v. Allwright*, 321 U.S. 649, 663-64 (1944). States may regulate

3

privately organized political parties in this manner because those parties surrendered some autonomy in exchange for receiving from the state "a role in the election process." *N.Y. State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 203 (2008).

Unlike some states, Texas does not open its primary elections to any and all voters. *See Tashjian*, 479 U.S. at 222 n.11. A voter must choose a political party to affiliate with before being allowed to participate in that party's primary. *See* Tex. Elec. Code §§162.001-162.014. They can make that choice either before or on the day of the primary election. First, a voter can "affiliate with a political party" before the election "by taking an oath of affiliation." *Id.* §162.008(a). That oath requires the voter to declare that they "hereby affiliate [themself] with the _____ Party." *Id.* §162.008(b). After taking that oath, their voter registration card is physically stamped with "the party's name in the party affiliation space." *Id.* §162.008(c). If the voter does not have their voter-registration certificate, the voter may request to be issued an "affiliation certificate" that (among other things) lists "the name of the political party of the affiliation," the "name of the person to whom the certificate is issued," and "the date of affiliation." *Id.* §162.009(1)-(2), (5). Second, a voter can "affiliate[] with a political party" on election day by being "accepted to vote in the party's primary election." *Id.* §162.003(1). The party may require a voter that affiliates by participating in a primary election to either have their voter-registration certificate stamped with their party affiliation or receive an affiliation certificate. *See id.* §162.004. The voter's affiliation lasts until the end of the voting year, *see id.* §162.010, and voters that affiliate with one party cannot vote in another party's primary or runoff elections, *id.* §162.012; *id.* §162.014.

Texas has held primaries in this manner for nearly 70 years. *See* O. Douglas Weeks, *A Comprehensive History of Texas Election Laws*, Tex. State Historical Ass'n (2016), https://perma.cc/3UYH-ZMV4. Because the State does not require voters to pre-register their

affiliation at the time they register to vote, Compl. ¶16, it uses the affiliation procedures to ensure that voters align themselves with the party in whose primary elections they seek to participate.

## B.    Procedural Background

In the lead up to the 2026 primary elections, the Republican Party of Texas decided that the State's open primaries weaken the Party and burden its associational rights under the First Amendment.  So it urged the Republican-controlled legislature to amend the Election Code to allow for closed primaries.  *See* Compl. ¶¶66-68.

When those efforts failed, the Party decided to take another approach.  In June 2025, the Party's Executive Committee adopted the current version of Rule 46, which provides that, "[i]n Texas Republican Primary Elections and Texas Republican Primary Runoff Elections, only a United States citizen eligible to vote in Texas who is registered to vote with the Texas Secretary of State as a Republican may cast a ballot in those elections."  *Id.* ¶¶62-63; *see* Rules of the Republican Party of Texas at 40 (2025) (attached as Exhibit A).  The Party's Executive Committee approved that Rule even though it does not address *how* Texas' 18 million registered voters would update their voter-registration records to include their party affiliation.  The Party instead assumed that the Secretary would unilaterally devise and implement a closed-primary scheme—a process that by state law belongs to the Texas Legislature.  *See* Tex. Elec. Code §276.019 (public officials "may not create, alter, modify, waive, or suspend any election standard, practice, or procedure mandated by law or rule in a manner not expressly authorized by [the Election Code]").

In September, the Republican Party of Texas, along with longtime Republican voter Chip Hunt, filed this suit alleging that the various provisions of the Election Code that govern primaries violate their First Amendment right to freedom of association.  *See* Compl. ¶¶10-11, 80-89.  As relief, the Plaintiffs requested a declaration "that the Republican Party of Texas has a constitutional

right to select its nominees through a closed-primary system and that the Texas Election Code provisions applicable to partisan primaries are unconstitutional insofar as they require the Republican [P]arty of Texas to select its nominees through an open-primary system." *Id.* ¶90. They also sought an injunction forbidding the State of Texas and the Secretary of State from enforcing portions of the Election Code that, in their view, "require that nominees of the Republican Party of Texas be selected through an open primary." *Id.* ¶91. Shortly after, the Plaintiffs jointly moved with the State for a consent judgment declaring the Texas primary system unconstitutional.

## LEGAL STANDARD

Under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted). Although the Court "accept[s] all well-pleaded facts as true," it does not "accept as true legal conclusions, conclusory statements, or 'naked assertion[s]' devoid of 'further factual enhancement.'" *Benfield v. Magee*, 945 F.3d 333, 336-37 (5th Cir. 2019) (quoting *Ashcroft*, 556 U.S. at 678). The allegations must "raise a right to relief above the speculative level," *id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)), meaning "the well-pleaded facts must make relief plausible, not merely possible," *id.* (quoting *Ashcroft*, 556 U.S. at 678).

## ARGUMENT

### I.   This Court Lacks Jurisdiction Over The Party's Lawsuit.

This dispute does not belong in federal court. The Complaint alleges that the Texas Election Code burdens the Party's associational rights by requiring open primaries contrary to Party Rule 46's closed-primary mandate. That supposed conflict is the core of the Party's constitutional claim. But the Party failed to mention that Rule 46 is a temporary rule. It cannot apply—not now, not during the upcoming primaries, not ever—absent approval from the Party at the June 2026

Convention.  Because it remains to be seen whether the Party will *ever* make Rule 46 permanent, this premature lawsuit qualifies as neither an Article III "Case" nor a "Controversy."  U.S. Const. art. III, §2.  But even if it did, the Court should at minimum dismiss from this action both the State of Texas (because it is immune from suit) and Chip Hunt (because she lacks standing).

### A.  The Court Should Dismiss the Entire Action for Lack of Jurisdiction.

It is a "cardinal rule" that federal courts should "never … anticipate a question of constitutional law in advance of the necessity of deciding it."  *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 501 (1985) (citation omitted).  That limitation on the judiciary "is founded in concern about the proper—and properly limited—role of courts in a democratic society."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 492-93 (2009).  Article III employs various doctrines to ensure that federal courts maintain their "proper" role of resolving "genuine, live dispute[s]" rather than "issuing advisory opinions."  *Carney v. Adams*, 592 U.S. 53, 58 (2020).  This dispute implicates two of those doctrines:  standing and ripeness.

1.    The Party lacks standing to challenge Texas' open-primary provisions because it has not adopted a permanent closed-primary rule.  At the motion-to-dismiss stage, the Party must plausibly allege that (1) "it has suffered, or imminently will suffer, a concrete and particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury."  *Houston Chron. Pub. Co. v. City of League City*, 488 F.3d 613, 617 (5th Cir. 2007).  Speculative injuries do not open the doors to federal court.  *See Barber v. Bryant*, 860 F.3d 345, 357 (5th Cir. 2017).  But here, that is all the Plaintiffs can muster.

To begin, the Party cannot "close its primaries" during the 2026 elections because Rule 46 cannot take effect until January 1, 2027.  Compl. ¶2.  The Complaint mentions Rule 46 dozens of times, yet it fails to disclose a material fact about that Rule—namely, that it comes with a

"proviso." *See* Ex. A at 40.  That "proviso" explains that "rules on electoral affairs … take effect on January 1 of the odd-numbered year following the biennial Republican Party of Texas State Convention." *Id.*  Because the Party adopted Rule 46 "[i]n 2025," Compl. ¶62, and because Rule 46 governs "electoral affairs" by changing how the Party runs primary elections, it cannot take effect until January 1, 2027.  Any remaining doubt about when Rule 46 takes effect is dispelled by Party Rule 1(e), which confirms that "[a]ny amendments made to these Rules and contained herein which govern or affect the Republican Party of Texas' general or runoff primary elections … are effective January 1 on the odd-numbered year following adoption." Ex. A at 5.  Rule 46 "affect[s]" the Party's "primary elections," so it cannot kick in until January 1, 2027.  *Id.*

Even once January 2027 arrives, Rule 46 will not take effect unless it is approved at the Party's State Convention in June 2026.  Party Rule 1(b) provides in relevant part that "[t]hese Rules … may be changed only by action of a State Convention, such action reflecting a majority of votes cast by delegates present and voting." *Id.* at 4.  And although the Party's Executive Committee may adopt "temporary and emergency changes" to the Rules, those are "valid only until such time, if any, as they are ratified or amended by the next subsequent State Convention, or until the adjournment of such State Convention, whichever shall occur first." *Id.*  Rule 46 was adopted by "the Party's Executive Committee" as a temporary change, Compl. ¶62; *see* Ex. A at 41 (confirming that the "State Executive Committee … changed Rule No. 46"), meaning it will cease to exist on the final day of the Convention unless "ratified or amended" by the Party delegates.[1]

---

[1] The Executive Committee has the authority to adopt "Permanent State Executive Committee Rules" that take effect without approval from the State Convention as a whole.  *See* Rule 1(b), (d), Ex. A at 4.  But those rules must be identified in the rules "by the notation '(Permanent State Executive Committee Rule).'"  Rule 1(d)(1), Ex. A at 4; *see, e.g.*, Rule 8(i), Ex. A at 8; Rule 8A, Ex. A at 10; Rule 19, Ex. A at 14; Rule 27A, Ex. A at 22.  Rule 46 omits that notation.

The absence of a permanent closed-primary rule defeats jurisdiction twice over. First, it renders the Party's allegations of harm "too conjectural and hypothetical to provide … standing." *Prestage Farms, Inc. v. Bd. of Supervisors*, 205 F.3d 265, 268 (5th Cir. 2000). The Party's associational injury allegedly derives from a "direct conflict" between "Texas law" and "the Party's rule" that limits participation in the Party's primary elections to those that have "registered to vote with the Texas Secretary of State as a Republican." Compl. ¶¶63, 83, 84; *see id.* at ¶84 (alleging that Texas law forces the Party to associate with "voters who do not meet the Party's criteria for voting in its primary elections, *as set out in Rule 46*" (emphasis added)). But because Rule 46 cannot apply absent further approval from the Party's Convention delegates, nobody knows whether the injurious "conflict" between state law and Rule 46 will ever materialize. *Id.* at ¶83-84. That is a textbook example of a speculative injury that falls short of Article III's requirements. Second, even if the Party *is* currently suffering a cognizable injury from forced association, that associational harm would not be redressed by a favorable decision because the Party lacks a closed-primary rule, meaning it would still associate with unwanted voters even if it wins this suit. And even if it had a permanent closed primary rule, the Party still depends on the hypothetical future acts of the legislature to actually implement the closed-primary system it seeks. *See* Opp. to Mot. for Consent Judgment, at 6-7 (to be docketed at Dkt. 31).

The Fifth Circuit's decision in *Mississippi State Democratic Party v. Barbour*, 529 F.3d 538 (5th Cir. 2008), confirms the fatal jurisdictional deficiencies with the Party's lawsuit. There, the Democratic Party challenged Mississippi's semi-closed primary, which (like Texas) "allows voters to affiliate with the party at the time of the primary." *Id.* at 540-41 & 541 n.1. The Democratic Party sued because it "wanted to curtail alleged 'party raiding' and crossover voting" by implementing a closed primary. *See id.* at 541, 542-43. But a jurisdictional problem arose because

the party had "taken no steps internally to limit participation in its primaries to members of the Democrat party"—that is, it had not "adopted any policies to exclude voters not registered as Democrats from its primary." *Id.* at 544, 545. Because the party never "formally adopted" a closed-primary "policy," it "suffered no threat of *imminent* injury." *Id.* at 546, 547. The Court concluded that, "[w]hen [the party] actually decides to adopt a closed primary, and when the [challenged law] has a demonstrated impact on the conduct of primary elections, a justiciable case or controversy will exist." *Id.* at 548. Until then, the party lacked standing.

The Party here suffers the same problems as the Democratic Party in *Barbour*. Both parties wanted to close their primaries in an effort to combat party raiding. *Compare* Compl. ¶¶55-56, 62, *with Barbour*, 529 F.3d at 541. Both parties alleged that the then-existing open-primary laws violated their associational rights. *Compare* Compl. ¶¶80-89, *with Barbour*, 529 F.3d at 542-43. Both parties expressed desire to close their primaries—in Texas, the Party passed a temporary rule that might never take effect; in Mississippi, the party "declar[ed] its intention, were [the challenged law] not in place, to hold closed primaries." *Barbour*, 529 F.3d at 545. But neither party took the critical step of adopting a legally operative closed-primary rule. There is no reason to treat the Party here differently than the party in *Barbour*. *See id.* at 548.

The absence of a permanent closed-primary rule makes this case materially different from those that the Party relies on in its Complaint. Compl. ¶¶1, 5, 81 (citing *Jones*, 530 U.S. 567, *La Follette*, 450 U.S. 107, and *Idaho Republican Party v. Ysursa*, 765 F.Supp.2d 1266 (D. Idaho 2011)). The parties in those cases had "rule[s] prohibiting persons not members of the party from voting in the party's primary." *Jones*, 530 U.S. at 571; *see Ysursa*, 765 F.Supp.2d at 1270 (discussing how "the Idaho Republican Party State Central Committee adopted the Closed Republican Party Primary Rule"); *La Follette*, 450 U.S. at 109 (the "National Party's Delegate Selection Rules

10

provide that only those who are willing to affiliate publicly with the Democratic Party may partic-ipate in the process of selecting delegates"). That contrasts sharply with the Party's failure to adopt a permanent rule here.

2.    Even if the Party *did* have standing at this juncture, the Court should still dismiss this action for lack of ripeness. "At its core, ripeness is a matter of timing that serves to prevent courts from entangling themselves in cases prematurely." *Walmart, Inc. v. U.S. Dep't of Justice*, 21 F.4th 300, 312 (5th Cir. 2021). "To determine whether claims are ripe, [courts] evaluate (1) the fitness of the issues for judicial resolution, and (2) the potential hardship to the parties caused by declining court consideration." *Lopez v. City of Houston*, 617 F.3d 336, 341 (5th Cir. 2010). Issues are not fit for review if they "rest[] upon contingent future events that may not occur as anticipated, or indeed may not occur at all," *Inst. for Free Speech v. Johnson*, 148 F.4th 318, 331 (5th Cir. 2025), or if they would "benefit from … further factual development," *DM Arbor Ct., Ltd. v. City of Houston*, 988 F.3d 215, 218 (5th Cir. 2021). But even if the case "presents purely legal ques-tions, the plaintiff must [still] show some hardship in order to establish ripeness." *Texas v. United States*, 497 F.3d 491, 498 (5th Cir. 2007). Neither ripeness element is met here.

Start with the Party's failure to satisfy the fitness-for-review factor. Like in *Barbour*, the associational-harm claim here rests on contingent future events because it remains to be seen whether the Party will adopt a permanent closed-primary "policy contrary to the statute." 529 F.3d at 547. That might not "occur at all," *Johnson*, 148 F.4th at 331, in which case the Court would have waded into this fraught challenge for nothing. Next, the court would benefit from "[f]urther factual development" about how the Party's anticipated closed primary would operate. *Barbour*, 529 F.3d at 547. The Party urges the Court to declare the open primary unconstitutional and enjoin the existing affiliation system. What comes next? Nobody knows. The Party suggests that a

ruling that effectively destroys how Texas runs its primary elections "*should* prompt the Legislature to implement closed primaries in a way that respects both the Party's constitutional rights and the State's interests in orderly voter registration and elections." Compl. ¶1. What if the legislature does not act? How many election cycles must Texas hold without parameters on how its primaries operate? The Party tries to provide reassurance that, if the legislature does not act, then *it* will "begin taking the substantial steps necessary to transition seamlessly to a closed Republican primary." *Id.* But it also recognizes that "transitioning millions of Texas voters and the Texas election apparatus … takes time and effort." *Id.* at ¶4. Nobody knows how long the Party plans to give the legislature to "implement closed … primaries" before it begins the time-consuming and resource-intensive transition on its own, *see id.* ¶¶75-77, or how long that transition will take.

Those fitness-for-review defects matter for several reasons. Most obviously, it would be incredibly disruptive to the electoral process—not to mention a waste of scarce judicial resources—for the Court to decide the constitutional question and issue equitable relief before the Party even adopts a permanent closed-primary rule that spells out the manner and consequence of party registration. *Cf. Purcell v. Gonzalez*, 549 U.S. 1, 4-6 (2006). Even setting that aside, the Court's consideration of the merits of the Party's alleged associational injury would benefit from further factual development. The Party's associational harm rests on the premise that "independent voters and Democrat voters" cross over and vote in the Republican primary. Compl. ¶84. But crossover voting might happen just as much in a closed primary, depending on how exactly the Party (or the legislature) directs officials to track party affiliation. Imagine, for example, that the closed-primary system allows voters to officially register as a Republican or Democrat on the same day as the election. That would be functionally equivalent to the current system that allows voters to declare their affiliation at the primary election, *see Miller v. Cunningham*, 512 F.3d 98, 107 (4th

Cir. 2007) (Wilkinson, J., dissenting from the denial of the petition for rehearing en banc) ("Constitutionally speaking, an open primary functions the same way as a closed primary with same-day registration.")—making the associational burden under the current system identical to what it would be under the closed-primary system. The point is that this Court has no way of measuring the relative severity of the associational burden on the Party absent further factual development about how a closed primary would function in practice.

Nor can the Party establish that it would suffer any meaningful hardship from having to await review until when (if ever) it adopts a permanent closed-primary rule. This is not a case where an impending change in the law forces "an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance." *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 545 (5th Cir. 2008). On the contrary, the Party has expressly *disavowed* its intention to expend time and resources in response to the status quo open-primary law. *See* Compl. ¶¶75-79. Moreover, Texas has had an open primary for many decades—and the Republican Party, which has won consistent electoral victories under the system it now decries as unconstitutional, boasts that Texas "[w]ithout a doubt" is "the strongest Republican state in the nation." Press Release, *Texas GOP Moves to Protect Primary Elections from Outside Interference, Republican Party of Texas* (June 16, 2025), https://perma.cc/3U2L-98SD; *see* Compl. ¶51 n.9 (citing this source). Although the Party's desire for "legal certainty" about the open-primary law is understandable, Compl. ¶6, the Supreme Court has thoroughly rejected the idea that "mere uncertainty as to the validity of a legal rule constitutes a hardship for purposes of the ripeness analysis," *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 811 (2003).

Given the entirely speculative nature of the harm it purports to suffer, it is doubtful that the Party will ever be able to show that Texas' affiliation scheme has inflicted a cognizable injury.

But it must at least adopt a permanent closed-primary rule and provide details about the voting scheme it seeks to implement before the Court can reach the merits. *See, e.g.*, *Barbour*, 529 F.3d at 548. That sensible requirement prevents parties and courts from "speculating about the form" that a closed-primary rule and registration scheme would take, *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 455 (2008), and honors the bedrock rule that courts "avoid the unnecessary resolution of constitutional questions," *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 197 (2009).

### B.    The State of Texas Is Immune From Suit.

"States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution." *Alden v. Maine*, 527 U.S. 706, 713 (1999). And "[w]hen 'the States entered the federal system,' they did so 'with their sovereignty intact.'" *PennEast Pipeline Co., LLC v. New Jersey*, 594 U.S. 482, 499 (2021) (citation omitted). One element of sovereignty that states retained is their immunity from private suits brought against the state without its consent. *See Franchise Tax Bd. v. Hyatt*, 587 U.S. 230, 238-41 (2019). That immunity extends to actions like this one that assert claims for declaratory and injunctive relief against the State of Texas. *See P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146-47 (1993) ("suits against the States … are barred regardless of the relief sought").

That means the State of Texas is immune and should be dismissed from this suit. Although "a state may choose to waive its immunity," *Magnolia Venture Cap. Corp. v. Prudential Secs., Inc.*, 151 F.3d 439, 443 (5th Cir. 1998), "it is the *Legislature's* sole province to waive or abrogate sovereign immunity," *Hillman v. Nueces County*, 579 S.W.3d 354, 363 (Tex. 2019) (emphasis added) (citation omitted); *see Magnolia*, 151 F.3d at 444. And since the authority to waive immunity belongs exclusively to the legislature, "neither the executive or judicial branches of the

State government may exercise such power." *Dep't of Pub. Safety v. Great S.W. Warehouses*, 352 S.W.2d 493, 495 (Tex. Civ. App. 1961). That means the Attorney General lacks "legal power or authority to waive the right of the State to immunity from the suit." *Id.*[2]

The Attorney General's inability to waive the State's immunity from suit is confirmed by state statute. The Texas Government Code provides that "[a]n admission, agreement, or waiver made by the attorney general in an action or suit to which the state is a party does not prejudice the rights of the state." Tex. Gov't Code §402.004. So whatever arguments the Attorney General may raise in his rush to waive the State's immunity fail as a matter of law. *See Great S.W. Warehouses*, 352 S.W.2d at 495 (interpreting Art. 4411, the predecessor statute to §402.004); *see also Tex. Dep't of Corrections v. Herring*, 513 S.W.2d 6, 8 (Tex. 1974) (reproducing Art. 4411's text).

Indeed, Attorney General Paxton himself has recognized that §402.004 prevents "the Attorney General … [from] waiv[ing] rights of the State (such as sovereign immunity) through actions during litigation." Br. of Appellee Glenn Hegar, Texas Comptroller of Public Accounts, *Hines v. Hegar*, No. 10-20-00220-CV (Tex. Ct. App. Sept. 24, 2021), 2021 WL 5539873, at *27; *see also* Pet'r's Br. on the Merits, *Berry v. Tarrant Cnty. Democratic Party*, No. 14-0470 (Tex. Jan. 21, 2015), 2015 WL 333304, at *19. So have Texas Attorneys General before him. *See, e.g.*, Resp'ts' Br. on the Merits, *My-Tech, Inc. v. Univ. of N. Tex. Health Sci. Ctr.*, No. 05-0590 (Tex. Jan. 18, 2006), 2006 WL 272713, at *20-21; Reply Br. of Appellants/Response Br. of Cross-Appellees State of Texas & Governor George W. Bush, *In re Priv. Couns. Agreement*, Nos. 00-40024,

---

[2] Because the Attorney General has already asked the Court to enter judgment against his client, the State of Texas, it seems unlikely that he will assert the State's (obviously meritorious) sovereign-immunity defense. But that does not preclude the Court from addressing the issue *sua sponte. See Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 333 n.8 (5th Cir. 2002). It follows that the Court may consider that issue when raised by another party. And it is especially appropriate for the Court to reach the immunity question here because the Attorney General lacks authority to waive the State's immunity in this context.

00-40036, 00-40038 (5th Cir. May 24, 2000), 2000 WL 34216058, at *28 ("Texas law specifically and unequivocally denies to the Attorney General the authority to waive the State's immunity through '[a]n admission, agreement, or waiver'").  This Court should do the same.

### C.    Chip Hunt Lacks Standing to Bring a First Amendment Challenge.

Article III requires a plaintiff to suffer a "concrete and particularized" injury to bring suit in federal court.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  The Complaint fails to allege how Hunt has suffered any such injury.  The Complaint alleges that the Texas Election Code "violates the First Amendment rights of the Republican Party of Texas."  Compl. ¶1.  It does not explain how the challenged laws burden Hunt's First Amendment rights or otherwise explain how Hunt can assert the Party's associational interests.  At a minimum, the Court should dismiss Hunt from the lawsuit for lack of standing.

## II.    The Complaint Fails To State A Claim.

Even if this Court were to reach the merits, it should dismiss the Complaint because the Party's allegations fail to state a claim.  Courts review a political party's associational-rights claim under the First Amendment with a two-step inquiry.  At the first step, the court "weigh[s] the character and magnitude of the burden the State's rule imposes on those rights" and classifies the burden as "severe" or something less.  *Timmons*, 520 U.S. at 358.  At the second step, the court applies the appropriate level of scrutiny—strict scrutiny for "severe burdens," and relaxed review for everything else.  *See id.*  Here, the State's open-primary provisions impose modest associational burdens at most.  But whatever standard applies, the challenged provisions withstand scrutiny.

### A.    The Election Code Does Not Severely Burden the Party's Associational Rights.

The Party comes nowhere close to establishing that the Election Code severely burdens its associational rights.  For three reasons, the Court should conclude that Texas imposes modest

burdens on the Party's freedom to associate. First, Texas law requires would-be voters to meaningfully affiliate with a political party before participating in that party's primary election. Second, the Party has not plausibly alleged that the Election Code materially impairs its ability to shape its message and choose its standard bearers. And third, the Party has not shown how a closed primary (the details of which remain unknown) will materially decrease the associational burdens that the Party suffers. Together, those points confirm that the challenged provisions are precisely the type of "reasonable" and "nondiscriminatory" regulations that states "may, and inevitably must, enact … to reduce election- and campaign-related disorder." *Timmons*, 520 U.S. at 358.

1.     The Election Code does not severely burden the Party's associational interests because it requires voters to affiliate with a party before participating in that party's primary. Contrary to what the Complaint alleges, Texas does not open the Party's primary election to voters who lack an "actual and express affiliation" with the Party. Compl. ¶19.

Texas voters affiliate with parties through one of three ways: (1) by voting in that party's primary, (2) by taking an oath at a party precinct convention, or (3) by taking an oath of affiliation administered by a party officer. Tex. Elec. Code §§162.003, 162.006, 162.007. Affiliating with a party has several consequences. First, an affiliated voter cannot vote in the primary or primary runoff of another party. *Id*. §§162.012, 162.013. Second, an affiliated voter cannot participate in the affairs of other parties—and parties have the right to create their own rules limiting the involvement of unaffiliated individuals in party affairs. *See id*. §§162.014, 162.001(a)(4). Third, a person who affiliates with a party by voting in that party's primary election cannot run as an independent or as the nominee for another party in the next election. *See id*. §162.015.

The Election Code also protects a party's associational rights through means other than the affiliation requirements. A candidate for nomination in a primary cannot run as an independent

candidate for that office in the next general election or as the nominee of another party. *Id*. Like-

wise, a person who signs a candidate's petition for a place on the primary ballot can vote only in

the primary and participate only in the convention of that candidate's party during the same voting

year. *Id*. §172.026. It is also the parties that select the election judges in separate primary elections

and the list of people eligible to work as election judges in November even-year elections, in which

local, statewide, and federal offices are on the ballot. *See id.* §§32.002, 32.006.

The Party's insistence that the Election Code invites "unaffiliated" voters to participate in

the Party's affairs lacks merit. Compl. ¶85. No matter what method a Texan uses to vote, "the

fact that [they] voted in a particular party's primary is public information and [their name] will be

listed in that party's early voting and election day rosters." Tex. Sec'y of State, *Party Affiliation*,

https://perma.cc/B6UP-XRTC (last visited October 29, 2025); *see* Compl. ¶18 n.3 (citing this

source). The voter's participation in a primary election is reflected on the official list of registered

voters, which election officials use to ensure that the voter does not participate in any other party's

primary elections or conventions in the same voting year. Tex. Elec. Code §172.115. State law

authorizes each county party to create additional records of a voter's affiliation. When participat-

ing in counties that create additional records, a voter must either present their "voter registration

certificate" so that an election officer can physically "stamp the party's name in the party affiliation

space," or the party can require those voters to be provided with an affiliation certificate at the

polling place or with the voter's balloting materials if the voter is voting by mail. *Id.* §§162.004,

162.005. Voters can also request to have their voter registration certificate stamped with their

chosen affiliation or can request an affiliation certificate by taking "an oath of affiliation" swearing

that they "have not voted in a primary election or participated in a convention of another party

during this voting year," and that they "hereby affiliate [themself] with the _____ Party." *Id.* §162.007(b), (c); *id.* §162.008.

With that in mind, it is no wonder that the Supreme Court already rejected the Party's position that Texas forces parties to allow "persons wholly unaffiliated with the party" to vote in their primaries. *Jones*, 530 U.S. at 581. In *Tashjian*, 479 U.S. 208, the Court held that Connecticut could not enforce a statute that forbade the Republican party—in violation of the party's rules— from allowing independent voters to participate in its primary. As relevant here, *Tashjian* surveyed state election laws and identified nine states that have "adopted classical 'open' primaries, in which all registered voters may choose in which party primary to vote." *Id.* at 222 n.11. Texas was not among those nine states. Instead, it was one of 16 states that allow someone "to vote in a party primary *if he affiliates with the party* at the time of, or for the purpose of, voting in the primary." *Id.* (citing Tex. Elec. Code §162.003). *Tashjian* thus rejected the Party's premise that Texas forces it to include "unaffiliated" voters in its primary elections. Compl. ¶85.

That affiliation requirement makes the Texas Election Code materially different from the blanket-primary regime that the Supreme Court held unconstitutional in *California Democratic Party v. Jones*, 530 U.S. 567, 574 (2000). *Contra* Compl. ¶1, 3, 36, 56, 81, 82, 84, 86 (relying on *Jones*). There, the California law forced the party "to associate with … those who, at best, have refused to affiliate with the party, and, at worst, have expressly affiliated with a rival." 530 U.S. at 577. But here, voters *must* affiliate with a party to participate in that party's primary—and the State attaches meaningful consequences to a voter's decision to affiliate with one party to the exclusion of others. Tex. Elec. Code §§162.003-.008. In contrast to California, it is a criminal offense for voters "expressly affiliated with a rival" to vote in another party's primary. *Jones*, 530 U.S. at 577; *see* Tex. Elec. Code §162.014. So unlike the blanket primary that allowed people to

19

"vote … for any candidate regardless of the candidate's political affiliation," *Jones*, 530 U.S. at 570, 576 n.6, voters in Texas *are* "put … to [the] hard choice" of choosing their party, *id.* at 584.

*Jones* expressly distinguished the (unconstitutional) blanket primary from other electoral regimes—including open and closed primaries.  The Court considered the blanket primary "qualitatively different from a closed primary" because, "even when it is made quite easy for a voter to change his party affiliation the day of the primary, and thus, in some sense, to 'cross over,' at least he must formally *become a member of the party*; and once he does so, he is limited to voting for candidates of that party." *Id.* at 577.  Open primaries "also may be constitutionally distinct" from the blanket primary for similar reasons.  *Id.* at 577 n.8.  Importantly, the hallmarks that made the closed primary different from the blanket primary apply just as much to Texas' system:  Although a voter that typically participates in Democratic primaries may "cross over" and vote in a Republican primary, he must first "become a member of the party" by declaring his affiliation and thus be "limited to voting for candidates of that party." *Id* (emphasis omitted)*.*  Indeed, "[c]onstitutionally speaking, an open primary functions the same way as a closed primary with same-day registration." *Miller*, 512 F.3d at 107 (Wilkinson, J., dissenting from the denial of the petition for rehearing en banc).

Although the Party complains that the State's affiliation requirement does not guarantee a "real connection" between a political party and its affiliates, the Supreme Court says otherwise.  The Court has repeatedly affirmed that individuals can "'join' a political party merely by asking for the appropriate ballot at the appropriate time," *Clingman*, 544 U.S. at 590 (plurality opinion); *Jones*, 530 U.S. at 577 n.8 ("[t]he act of voting in the Democratic primary fairly can be described as an act of affiliation with the Democratic Party" (citation omitted)), and that doing so is a "form of association that is at least as important as the act of registering" with a party, *Clingman*, 544

20

U.S. at 601 (O'Connor, J., concurring in part and dissenting in part).  And here, Texans must not only ask for the "appropriate ballot"; they must make their affiliation public and live with the consequences that accompany affiliating with one party to the exclusion of others.  The Party provides no reason why those procedures do not ensure meaningful affiliation.

2.    The Party likewise cannot show a severe associational burden because it did not plausibly allege that the Election Code materially impairs its ability to shape its message and choose its standard bearers.  For starters, the Party's allegations about crossover voting do not move the needle because the Election Code requires someone to affiliate with a party before they vote in that party's primary election.  *See supra*, pp.17-20.  State law therefore already forbids "Democrats" or "Independents"—meaning those who are unaffiliated with the Party—from voting in the Republican primary.  *See* Tex. Elec. Code §162.012.

Although the Party alleges that "significant numbers" of "independents and Democrats" affiliate with the Republican Party "to influence the results of those primary elections," Compl. ¶44, the Court should not credit those "conclusory allegations," *Coleman v. Lincoln Parish Det. Ctr.*, 858 F.3d 307, 309 (5th Cir. 2017) (per curiam).  Because Texas does not track voter affiliation, the Plaintiffs are forced to speculate that "known Democrats" crossed over in "significant numbers" to influence the Republican primary elections.  Compl. ¶¶44, 51; *see Wash. State Grange*, 552 U.S. at 451.  Moreover, the Party did not plausibly allege that it occurs with such frequency and intensity to "seriously distort[] [the Party's] collective decisions."  Compl. ¶85.

In fact, the only evidence the Plaintiffs cited to claim harm caused by crossover voting involved two recent primary elections.  The Plaintiffs did not plausibly allege that crossover voting occurred in those elections.  Indeed, for one of those elections, the plaintiffs did not even allege that crossover voting *did* affect the outcome.  *See* Compl. ¶¶47-48.  In all events, even assuming

crossover voters cast the decisive ballots in those two elections, the Plaintiffs have not plausibly alleged that those outcomes are representative of primary elections in Texas or have materially affected the Party's ability to advance its interests. *See Democratic Party of Haw. v. Nago*, 833 F.3d 1119, 1122-25 (9th Cir. 2016). Identifying two examples from nearly 70 years of open primaries does not begin to establish that the Party faces a severe associational burden.

Yet again, comparing this case and *Jones* shows that the burden on the Party here is minor (at best) to modest (at worst). Survey evidence in *Jones* suggested that between 20 and 40 percent of *California* voters would cross over to vote in the other party's primary. 530 U.S. at 578. And "[i]n the first primaries [the] parties conducted" under the new blanket-primary policy, "the total votes cast for party candidates in some races was more than *double* the total number of *registered party members*." *Id.* (emphasis in original). The Court thus had before it evidence about how *California voters* would respond to the challenged law. The Complaint here includes no similar allegations; although it recites findings from multiple studies about various elections, none involves Texas. All that the Plaintiffs can offer is "sheer speculation" that Democrats and Independents are crossing over in droves to manipulate the outcome of the Party's primary elections.

3.     Finally, the Party has not adequately alleged that open primaries burden its associational rights any more severely than the closed-primary alternative for which the Party advocates. The Party objects to Texas law because it does not prevent voters that typically support Democrats or Independents from voting in the Republican primary by affiliating with the Republican Party. As discussed, the Party did not plausibly allege that this happens with sufficient frequency and intensity to meaningfully impair the Party's associational interests. *See supra*, pp.21-22. But even if it did, a closed primary would not stop that crossover voting from happening. All that crossover-inclined voters need do is "register" as a Republican instead of "affiliate" as a Republican.

Registered Republican voters that previously voted in the Republican primary, but newly identify as Democrats, would still be permitted to vote in the Republican primary. Neither regime can entirely prevent voters from casting strategic ballots in another party's primary.

The Supreme Court recognized as much in *Tashjian*. There, the Court held unconstitutional a state law "requiring voters in any party primary to be registered members of that party." 479 U.S. at 210-11. The state tried to justify the registration requirement as necessary to stop crossover voting, but the Court opined that the law did not meaningfully prevent voters from crossing over because they "need only register as Republicans" to vote in the primary. *Id.* at 219. In fact, the state law heightened the risk of crossover voting because it permitted "an independent to affiliate with the Party as late as noon on the business day preceding the primary." *Id.*

Here, too, it is entirely possible that crossover voting would be materially worse under the closed-primary regime that the Party seeks to impose. The Party does not allege to the contrary— nor could it, because neither the Party nor anyone else knows how exactly closed primaries would work. That raises ripeness problems, *see supra*, pp.11-14, but it also casts doubt on the severity of the burden the Party asserts. If crossover voting is the same or worse when primaries are closed, then the Election Code could not be fairly understood to impose a severe burden on the party's associational interests because the alternative imposes a similar or greater burden.

**B.    The Election Code Survives Constitutional Scrutiny.**

As the Supreme Court has explained, "not every electoral law that burdens associational rights is subject to strict scrutiny." *Clingman*, 544 U.S. at 592. Courts apply strict scrutiny only "if the burden is severe." *Id.* Because the challenged provisions of the Election Code impose modest burdens (at most) on the Party's associational rights, *see supra*, Argument II.A, Texas need only show that its election laws advance "important regulatory interests." *Clingman*, 544 U.S. at

593. It does. *See infra*, pp.24-25. Tellingly, the Party does not even allege that the challenged provisions fail scrutiny under that more relaxed standard; it alleges only that they cannot survive strict scrutiny. Compl. ¶86. So if the Court agrees that Texas law imposes non-severe burdens on the Party's associational rights, it should dismiss the Complaint for failure to state a claim.

Even if strict scrutiny applied, the challenged provisions are "narrowly tailored to serve a compelling state interest." *Jones*, 530 U.S. at 582. The Election Code "promotes the state's interest in encouraging voter participation." *Miller*, 512 F.3d at 109 (Wilkinson, J., dissenting from the denial of the petition for rehearing en banc). The Supreme Court has affirmed that "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society," *Reynolds v. Sims*, 377 U.S. 533, 555 (1964), and remarked that the conclusion reached by some courts that states have a "compelling state interest" in "encouraging voter participation … may well be correct," *La Follette*, 450 U.S. at 121.[3] The State has a compelling interest in laws that allow and encourage Texans "to cast their ballots and have them counted." *United States v. Classic*, 313 U.S. 299, 315 (1941); *see Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184-85 (1979) ("voting is of the most fundamental significance under our constitutional structure"); *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) (explaining that "[n]o right is more precious … than that of having a voice in the election"); *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) (voting is a "fundamental political right"). The State also has a compelling interest in ensuring that voters who newly (but sincerely) identify with the Republican Party may vote in the Party's primary election.

---

[3] The Court in *Jones* held that, "*in the circumstances of [that] case*," encouraging voter participation was not a compelling interest. 530 U.S. at 584. That does not control here because of the material differences between (1) the structure of the primary elections and (2) the nature of the state interest being asserted.

The Election Code is narrowly tailored to that interest because it allows participation in primary elections while respecting the party's associational interests through the requirement that voters affiliate with the party before voting in primaries. Texas has safeguards in place to prevent an already-affiliated voter from unlawfully interfering with another party's affairs. *See* Tex. Elec. Code §162.014. The State requires voters to mark on a signature roster the name of the party with which the voter has affiliated and requires the voter's participation in a primary election to be reflected on the lists of registered voters that are used for the primary elections and the party conventions. *See supra*, p.4. These voter-integrity measures ensure that Texas respects the Party's associational interests while also safeguarding the fundamental right to vote.

The Election Code also promotes the State's compelling interest in "protecting the integrity and reliability of the electoral process." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008); *see Timmons*, 520 U.S. at 364. It does so by providing clear and administrable rules of the road that balance the various competing constitutional interests. *See Burdick v. Takushi*, 504 U.S. 428, 433 (1992) ("there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes"). The system the Plaintiffs contemplate, on the other hand, would seriously undermine those compelling interests. The Plaintiffs ask the Court to declare bits and pieces of the Election Code unconstitutional and to enjoin the Secretary from enforcing them—but leave no plan for future elections. The Plaintiffs *hope* that declaratory and injunctive relief prompts the legislature to implement their desired system, but there is no way of knowing what comes next. The Election Code prevents the very instability that the Plaintiffs' lawsuit invites.

## CONCLUSION

The Court should grant the motion. At minimum, it should dismiss the State and Hunt.

Respectfully submitted,

/s/ *Erin E. Murphy*

**CLEMENT & MURPHY, PLLC**

Erin E. Murphy (*pro hac vice*)
James Y. Xi (*pro hac vice*)
Philip Hammersley (*pro hac vice*)
706 Duke Street
Alexandria, Virginia 22314
Tel: (202) 742-8912
Fax: (703) 997-6207
erin.murphy@clementmurphy.com
james.xi@clementmurphy.com
philip.hammersley@clementmurphy.com

**UNDERWOOD LAW FIRM, P.C.**

Thomas C. Riney
State Bar No. 16935100
C. Jason Fenton
State Bar No. 24087505
P.O. Box 9158 (79105-9158)
500 S. Taylor, Suite 1200
Amarillo, TX  79101
Telephone: (806) 376-5613
Facsimile: (806) 379-0316
tom.riney@uwlaw.com
jason.fenton@uwlaw.com

*Counsel for Defendant Secretary of State Nelson*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served upon all counsel of record on October 30, 2025, via the Court's CM/ECF system.

/s/ *Erin E. Murphy*
Erin E. Murphy