IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

**FILED**

**November 14, 2025**

KAREN MITCHELL
CLERK, U.S. DISTRICT
COURT

CHIP HUNT; REPUBLICAN PARTY OF
TEXAS,

               *Plaintiffs,*

    v.

STATE OF TEXAS; JANE NELSON, in her
official capacity as Texas Secretary of State,

               *Defendants.*

Case No. 2:25-cv-00200-Z

**BRIEF OF ANDREA GIBBUD, MELISSA HUGHES, NEVA KELLY, CATHY
ROZNOVSKY, COALITION OF TEXANS WITH DISABILITIES, AND TEXAS IMPACT
AS *AMICI CURIAE* IN SUPPORT OF DEFENDANT JANE NELSON'S OPPOSITION TO
THE JOINT MOTION FOR ENTRY OF CONSENT
JUDGMENT AND MOTION TO DISMISS**

## TABLE OF CONTENTS

INDEX OF AUTHORITIES.................................................................................................iii

STATEMENT OF INTEREST ........................................................................................... 1

INTRODUCTION ............................................................................................................. 5

ARGUMENT .................................................................................................................... 8

     I.     The proposed consent judgment's negative impact on third parties makes it unfit to be granted. ............................................................................... 8

     II.    The Legislature's choice of primary system reflects sound policy judgment that is not appropriate for federal court intervention. ......................................... 11

          A.     Requiring pre-registration would demonstrably burden voters. .............. 12

          B.     Requiring pre-registration would discourage potential Republican voters and harm those voters who currently affiliate with the Party. ...... 14

CONCLUSION.................................................................................................................. 16

CERTIFICATE OF SERVICE ......................................................................................... 18

# INDEX OF AUTHORITIES

**Cases**

*Bayou Fleet, Inc. v. Alexander*,
234 F.3d 852 (5th Cir. 2000) ............................................................................. 9

*California Democratic Party v. Jones*,
530 U.S. 567 (2000).......................................................................................... 6

*Clingman v. Beaver*,
544 U.S. 581 (2005) (O'Connor, J., concurring) ....................................... 11, 17

*Conant v. Brown*,
248 F. Supp. 3d 1014 (D. Or. 2017), *aff'd*, 726 Fed. Appx. 611 (9th Cir.
2018) ............................................................................................................. 6, 7

*Crawford v. Marion Cnty. Election Bd.*,
553 U.S. 181 (2008)..................................................................................... 12, 16

*Democratic Party of Hawaii v. Nago*,
982 F. Supp. 2d 1166 (D. Haw. 2013), *aff'd*, 833 F.3d 1119 (9th Cir. 2016).................. 10

*Democratic Party of the U.S. v. Wis. ex rel. La Follette*,
450 U.S. 107 (1981)........................................................................................... 6

*Greenville Cnty. Republican Party Executive Comm. v. South Carolina*,
824 F. Supp. 2d 655 (D.S.C. 2011).................................................................. 17

*Idaho Republican Party v. Ysursa*,
765 F. Supp. 2d 1266 (D. Idaho 2011) .............................................................. 6

*Jones v. Gusman*,
296 F.R.D. 416 (E.D. La. 2013).......................................................................... 9

*Kusper v. Pontikes*,
414 U.S. 51 (1973).............................................................................................. 8

*Kusper*, 414 U.S. at 58 ............................................................................................ 14

*League of United Latin Am. Citizens, Council No. 4434 v. Clements*,
999 F.2d 831 (5th Cir. 1993) .............................................................................. 8

*Local No. 93, Intern. Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*,
478 U.S. 501 (1986)............................................................................................ 9

*New York State Bd. of Elections v. Lopez Torres*,
552 U.S. 196 (2008)............................................................................................ 7

*Ravalli Cnty. Republican Cent. Comm. v. McCulloch,*
    154 F. Supp. 3d 1063 (D. Mont. 2015) ............................................................. 10

*System Federation No. 91, Ry. Employees' Dep't, AFL–CIO v. Wright,*
    364 U.S. 642 (1961) ...................................................................................... 8

*United States v. City of Miami,*
    664 F.2d 435 (5th Cir. 1981) (Rubin, J. concurring in *per curiam* opinion) ..................... 9

*Utah Republican Party v. Cox,*
    892 F.3d 1066 (10th Cir. 2018) ............................................................... 7, 11

*Washington State Grange v. Washington State Republican Party,*
    552 U.S. 442 (2008) .................................................................................. 10

*Williams v. City of New Orleans,*
    729 F.2d 1554 (5th Cir. 1984) ............................................................... 9, 11

**Statutes**

52 U.S.C. § 20506(a)(2) ................................................................................ 13

TEX. ELEC. CODE § 13.002, ch. 20 ................................................................. 12

TEX. ELEC. CODE § 13.031 ............................................................................. 13

TEX. ELEC. CODE § 13.039 ............................................................................. 13

TEX. ELEC. CODE § 162.003(1) ........................................................................ 6

TEX. ELEC. CODE § 162.004(a) ......................................................................... 6

TEX. ELEC. CODE § 162.004(a-1) ....................................................................... 6

TEX. ELEC. CODE § 18.008 ............................................................................... 7

TEX. ELEC. CODE § 18.066 ............................................................................... 7

**Other Authorities**

Alan S. Gerber, Donald P. Green & Ron Shachar, *Voting May Be Habit-Forming:*
    *Evidence from a Randomized Field Experiment*, 47 Am. J. Pol. Sci. 540,
    540–41 (2003) .......................................................................................... 15

Alexander Coppock & Donald P. Green, *Is Voting Habit Forming? New Evidence*
    *from Experiments and Regression Discontinuities*, 60 Am. J. Pol. Sci. 1044
    (2016) ...................................................................................................... 15

ANTHONY DOWNS, ECONOMIC THEORY OF DEMOCRACY 265 (1957) ........................................... 12

Bee County, Tex., *Cumulative Results Report: General Election (Nov. 5, 2024)* (Nov. 13, 2024) https://perma.cc/S7SZ-WMAL ................................................ 2

Bennion & David W. Nickerson, *I Will Register and Vote, If You Teach Me How: A Field Experiment Testing Voter Registration in College Classrooms*, 49 PS: Pol. Sci. & Pol. 867 (2016) ............................................................... 12

Berenice Garcia, *RNC Opens Hispanic Community Center in McAllen*, MyRGV (Oct. 5, 2021), https://perma.cc/HQ5D-JHBV ..................................... 16

Céline Braconnier, Jean-Yves Dormagen & Vincent Pons, *Voter Registration Costs and Disenfranchisement: Experimental Evidence from France*, 111 Am. Pol. Sci. Rev. 584 (2017) ............................................................. 12

Elias Dinas et al., *Early Voting Experiences and Habit Formation*, 12 Pol. Sci. Res. & Methods 195 (2024) .................................................. 15

H.B. 951, 89th Leg., Reg. Sess., Tex. (2025) ............................................ 12

Laura Rice, *Why Texas Is the Most Difficult State in the Country to Register Voters*, Texas Standard (Oct. 11, 2016), https://perma.cc/R96K-CJ9Y ....................................... 13

Lisa Schur & Douglas Kruse, *Fact Sheet: Disability and Voter Turnout in the 2020 Elections* at 11, Rutgers Univ. Sch. of Mgmt. & Lab. Rels. (2020), https://perma.cc/MH87-GCWZ ....................................... 4, 13

Nat'l Disability Rights Network, *Findings from 2020 Election Omnibus Survey* (2020), https://perma.cc/36UE-A7DT ................................... 15

Press Release, *Attorney General Abbott Obtains Voter Fraud Indictments in Two Counties* (Jun. 4, 2005), https://perma.cc/4VSZ-SJD5 ................................... 1

Ryan Data & Research, *2018 General Election Analysis*, Dallas Observer (Jan. 3, 2019), https://perma.cc/9U52-5UDA .................................. 15

Scot Schraufnagel, Michael J. Pomante II & Quan Li, *Cost of Voting in the American States: 2022*, 21 Election L.J. 220, 224 (2022) ................................ 12

Steven J. Rosenstone & Raymond E. Wolfinger, *The Effect of Registration Laws on Voter Turnout*, 72 Am. Pol. Sci. Rev. 22 (1978) ................................................ 12

Tex. Legis. Council, *Population, Voter Registration, Turnout, and SSTO Analysis: Congressional Districts–2016 Republican Primary Election Report PLANC2333_R237* (Aug. 18, 2025), https://perma.cc/N5GM-5BXV ............................. 16

Tex. Legis. Council, *Population, Voter Registration, Turnout, and SSTO Analysis: Congressional Districts–2024 Republican Primary Election Report PLANC2333_R237* (Aug. 18, 2025), https://perma.cc/DGE3-YFUS.............................. 16

Texas Workforce Investment Council, *People with Disabilities: A Texas Profile* (Jun. 2024), https://perma.cc/Z7XR-CTQT ....................................................................... 3

The Perryman Group, *The Potential Economic and Fiscal Impact of Closing Primaries in Texas* (Oct. 2025), https://perma.cc/JD48-V69K ......................................... 14

## STATEMENT OF INTEREST[1]

**Andrea Gibbud** is a registered voter in Bee County, Texas. Ms. Gibbud is a former Republican elected official. She served as the Bee County Tax Assessor-Collector from 1993 to 2008. In that position, she was the Voter Registrar for the County. She also previously served as a Chair of the Republican Women of Bee County, and won an outstanding service award from the Secretary of State. Ms. Gibbud continues to be a consistent Republican primary voter.

In her role as Registrar, her responsibilities included accepting, processing, and approving registration applications, issuing registration certificates, updating records for address or eligibility changes, and coordinating with the Secretary of State on the statewide voter registration system. Ms. Gibbud was also responsible for ensuring the integrity of the election rolls, and took active steps to combat voter fraud. *See* Press Release, *Attorney General Abbott Obtains Voter Fraud Indictments in Two Counties* (Jun. 4, 2005) (describing Assessor-Collector Gibbud's role in uncovering potential illegal voting in Bee County), https://perma.cc/4VSZ-SJD5.

To encourage civic participation, Ms. Gibbud set up booths at public functions to talk to eligible voters about registering to vote. She also visited high schools to speak with students who were turning 18 about registration. In Ms. Gibbud's professional experience, one of the most common things prospective new registrants asked was whether they would be forced to choose a party on their registration. She found that voters were uncomfortable having to commit to providing that information at the time of initial registration, and would have been discouraged from registering in the first place if they had to pre-register with a party. Given that Bee County is

---

[1] No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparation or submission of this brief, and no person other than the amici curiae or their counsel contributed money that was intended to fund preparation or submission of this brief.

overwhelmingly a Republican county, fewer registered voters would naturally lead to fewer Republican voters in the state. *See* Bee County, Tex., *Cumulative Results Report: General Election (Nov. 5, 2024)* (Nov. 13, 2024) https://perma.cc/S7SZ-WMAL (showing Donald Trump won 69.52% of the vote in 2024).

Ms. Gibbud believes that the Republican Party (and indeed any political party) is benefited by allowing same-day party affiliation. More people participating at every level of election helps the party ensure its candidates reflect the will of the people. Based on her decades of experience with voter registration, she believes requiring advanced pre-registration with a party would particularly discourage voters from participating in primary elections. Because voters who vote in the primary are far more likely to vote in the general election, this would further lead to fewer party voters overall.

Finally, as a former voter registrar, Ms. Gibbud knows how complicated it is to implement any sort of new voter registration procedures. Completely overhauling the registration system to create a new, unspecified pre-registration process would be a burden on the state, and an unfunded mandate on counties. It would likely lead to confusion and administrative glitches in the initial stages, which may cause voters to not appear on the rolls and discourage civic participation. For these reasons, as an individual Republican-primary voter and community member that has dedicated her personal time to increasing participation in both primary and general elections, Ms. Gibbud has an interest in keeping the current same-day party registration in place.

***Melissa Hughes, Neva Kelly and Cathy Roznovsky*** are registered voters in, respectively, Aransas County, Bexar County, and Bee County. They are consistent Republican primary voters, but none are comfortable pre-registering with the Republican Party because they value their political independence. As Texas women of faith, they believe their ultimate duty is to their

spiritual values, which makes it incumbent on them each year to assess which candidates best represent those values. They also believe that encouraging widespread civic and community engagement is a duty, and that making it harder to participate in the Republican primary would serve to deter civic engagement. This is particularly so for Ms. Hughes and Ms. Roznovsky, who live in predominantly Republican communities. Each of these voters is passionate about the type of local issues that impact their neighbors' day-to-day lives. For instance, as a resident of Rockport, Ms. Hughes has been motivated by candidates who focus on coastal matters and local affordability concerns, such as State Representative Todd Hunter, but she does not believe that she should have to go through extra internal party hurdles to vote for her preferred candidates.

**Coalition of Texans with Disabilities** ("CTD") is a 501(c)(3) organization. It was founded in 1978 and is the oldest and largest member-driven, cross-disability organization in the state. "Cross-disability" refers to all types of disabilities and different functional needs, rather than a particular disability or subset of disabilities. CTD works to eradicate barriers to full inclusion for disabled Texans in all walks of life, including the improvement of voting procedures and other opportunities for political participation, the removal of architectural and other physical obstacles, more accessible transportation, and enhanced healthcare.

The Texas Workforce Investment Council reports that "12.1 percent of the noninstitutionalized population in Texas (3,549,223 individuals) had a disability in 2022." Texas Workforce Investment Council, *People with Disabilities: A Texas Profile* at 15 (Jun. 2024), https://perma.cc/Z7XR-CTQT. As an organization that was around through the changes in voter registration systems as a result of the Help America Vote Act, CTD knows that it takes massive third-party outreach, education, and assistance efforts to help the Texas community of disabled voters register to vote whenever there is a major change. Because they have less ability to directly

access and utilize registration resources on their own, voters with disabilities are more likely than the general public to register at polling places, public assistance agencies, town halls, government registration offices, and third-party voter registration drives. Lisa Schur & Douglas Kruse, *Fact Sheet: Disability and Voter Turnout in the 2020 Elections* at 11, Rutgers Univ. Sch. of Mgmt. & Lab. Rels. (2020), https://perma.cc/MH87-GCWZ (hereinafter Schur & Kruse, *Fact Sheet*). However, voters only periodically interact with these locations and events, and a pre-registration requirement would force voters with disabilities who are already registered to re-register to reflect their party affiliation in order to participate in the Republican primary. This would impose a burden that will foreseeably lead to less participation.

Because CTD's purpose is to eradicate barriers to full participation for voters with disabilities, it has an interest in maintaining the ability of Texans to register with a party at the polling place. Further, it would have to expend resources to educate and assist in re-registering disabled voters who wished to participate in a primary election.

***Texas Impact*** is a 501(c)(4) organization. It was established in 1973, in the wake of a major corruption scandal, the Sharpstown scandal, that shook the Texas state government to its core. To Texas religious leaders, the scandal was proof that Texas officials were more concerned with their own welfare than with the welfare of the people of Texas, especially of the disadvantaged. The bishops, ministers, and lay leaders who established Texas Impact wrote that it was "increasingly clear" that the prophetic call to "do justice, love kindness, and walk humbly with God" could not be accomplished without attempting to influence public policy. Texas Impact equips faith leaders and their congregations with the information, opportunities, and outreach tools to educate their communities and engage with lawmakers on pressing public policy issues. It helps people live out their faith in the public square, moving the faith community from charity to justice.

"[S]elect capable men from all the people—men who fear God, trustworthy men who hate dishonest gain." *Exodus* 18:21 (NIV). Christian, Jewish, Muslim, and many non-Abrahamic faith traditions characterize voting as a matter of faith, citizenship, and democracy. Each vote serves as a kind of prayer, and a testament to the belief that every citizen bears a responsibility and equal right to determine the future of governance in society. Loving one's neighbor includes caring about the systems and structures that shape the life of the community, and voting often provides an opportunity to influence those systems and structures. Through the lens of faith, voting represents a spiritual discipline and a religious obligation. Imposing barriers to voting thus could thwart the faithful individual's religious practice in addition to their civic participation. Texas Impact therefore has an interest in opposing barriers to participation, such as an early registration deadline to vote in a primary election.

## INTRODUCTION

Plaintiffs seek to override the will of the Texas Legislature by using a federal court to prohibit same-day party registration in Texas. Beyond its jurisdictional and legal flaws, as set forth in briefing for the Texas Secretary of State, the Honorable Jane Nelson, Plaintiffs' requested relief would create a demonstrable burden on millions of Texans, including Amici and Amici organizations' members. Further, it would decrease party affiliation by disincentivizing participation in party politics. This would burden, rather than bolster, Amici's associational rights and would hurt the Republican Party in general elections. At a minimum, such a dramatic upending of a sovereign state's legitimate policy choice is not appropriate for disposition via consent judgment, with no factual record, by one of two co-Defendants.

To begin with, Plaintiffs' characterization of Texas's primary system as "open" is a misnomer. An "open" primary allows a person to vote without being "required to declare publicly

5

a party preference or to have that preference publicly recorded."[2] *Conant v. Brown*, 248 F. Supp. 3d 1014, 1021 (D. Or. 2017), *aff'd*, 726 Fed. Appx. 611 (9th Cir. 2018) (quoting *Democratic Party of the U.S. v. Wis. ex rel. La Follette*, 450 U.S. 107, 111 n. 4 (1981)); *see also California Democratic Party v. Jones*, 530 U.S. 567, 570 (2000) (noting that California's "blanket primary" was "qualitatively different from a closed primary" because "[u]nder that [closed-primary] system, even when it is made quite easy for a voter to change his party affiliation the day of the primary, . . . at least he must formally *become a member of the party;* and once he does so, he is limited to voting for candidates of that party.") (emphasis in original).

That is not the case in Texas. Rather, Texas has a system in which voters must affiliate with a political party in specified ways for a specified duration. One of those methods is by being "accepted to vote in the party's primary election." TEX. ELEC. CODE § 162.003(1). In order to be accepted, a voter cannot have affiliated with a different political party and must acknowledge, when signing the signature roster, that:

> A person commits a criminal offense if the person knowingly votes in a primary election or participates in a convention of a party after having voted in a primary election or participated in a convention of another party during the same voting year.

*Id.* § 162.004(a). Then, unless the party's county chair waives the requirement in advance, the voter's registration certificate is "stamp[e]d . . . with a party affiliation," or they are presented with an affiliation certificate. *Id.* § 162.004(a-1). Their participation in the party primary is

---

[2] This differs from *Idaho Republican Party v. Ysursa*, which Plaintiffs rely on, where the court highlighted that "[t]he voter's decision as to which political party's primary contest to participate in is made in the privacy of the voting booth and not by declaration to election or party officials." 765 F. Supp. 2d 1266, 1269 (D. Idaho 2011). It explicitly distinguished this from "a closed primary system, even when it is made quite easy for a voter to change his party affiliation the day of the primary," because Idaho's "open primary does not require such a formal declaration." *Id.* at 1276 (quoting *Jones*, 530 U.S. at 570).

"publicly recorded," *Conant*, 248 F. Supp. 3d at 1021, and available "on request" to any person via the statutorily public voter file. *See* TEX. ELEC. CODE §§ 18.008, 18.066.

Plaintiffs' complaint, therefore, is not that Texas allows unaffiliated, or cross-affiliated, voters to vote in a party's primary without "declar[ing] publicly a party preference or [having] that preference publicly recorded," *Conant*, 248 F. Supp. 3d at 1021. Rather, they assert that the United States Constitution *prohibits* same-day party registration and *requires* the State to force voters to pre-register with a party by some arbitrary date in "state-run, state-financed elections." *Utah Republican Party v. Cox*, 892 F.3d 1066, 1078 (10th Cir. 2018).

As Secretary Nelson sets forth, this Court has no subject matter jurisdiction to proceed because, as a matter of law, the United States Constitution does not *require* States to compel voters to pre-register with political parties. Federal courts have no authority to override the Texas Legislature's legitimate policy discretion about how voters can affiliate with political parties in order to participate in government-administered elections. It is only as creatures of Texas statute that the political parties have the advantage of being identified alongside candidates on the general election ballots. *See New York State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 203 (2008) (noting that a state "acquires a legitimate governmental interest" in regulating party nomination processes "when the State gives the party a role in the election process.").

Instead, as Amici's circumstances demonstrate, the Legislature has exercised sound policy judgment which benefits not only individual Texans but also the parties themselves. Rather than enhancing Texans' associational rights, creating burdens to participation would hinder those rights, particularly for Texans with disabilities who already face significant obstacles to participation. It would similarly hurt the Republican Party by dissuading individuals from affiliating with it. Regardless, this type of policy-interest balancing is for the Legislature, not federal courts.

**ARGUMENT**

On top of not meeting the basic legal standards for a consent judgment, as Secretary Nelson sets forth, the proposed judgment is inappropriate due to its negative impact on the associational rights of third parties. Here, the proposed judgment would create concrete burdens on participating in the most "basic function" of party politics, where an individual's right to associate is most important. *Kusper v. Pontikes*, 414 U.S. 51, 58 (1973). These burdens would fall disproportionately on certain groups, such as voters with disabilities. Additionally, as Amici show, a court-imposed pre-registration rule would dampen primary participation and yield fewer engaged party voters in November. Because the relative merits of these positions are policy judgments for the Legislature, not fit for resolution by consent decree in federal court, the motion for a consent judgment should be denied, and Secretary Nelson's motion to dismiss should be granted.

**I.    The proposed consent judgment's negative impact on third parties makes it unfit to be granted.**

In addition to the motion for consent judgment being unsupported by the evidence—of which there is none—or the applicable legal standards, it is inappropriate because it would negatively impact millions of Texas voters who are unrepresented in this litigation.

A "proposed consent decree is…a request for the court to exercise its equitable powers [but] is not a tool bending without question to the litigants' will." *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 846 (5th Cir. 1993). "[P]arties cannot, by giving each other consideration, purchase from a court of equity a continuing injunction." *System Federation No. 91, Ry. Employees' Dep't, AFL–CIO v. Wright*, 364 U.S. 642, 651 (1961). Instead, before entering a consent judgment or decree, courts must decide whether such a result "represents a reasonable factual and legal determination based on the facts of record, whether established by evidence, affidavit, or stipulation." *Williams v. City of New Orleans,* 729 F.2d 1554, 1559 (5th Cir.

1984) (quoting *United States v. City of Miami,* 664 F.2d 435, 441 (5th Cir. 1981) (Rubin, J. concurring in *per curiam* opinion). And courts must also ascertain both that the settlement is fair and that it does not violate the Constitution, statutes, or jurisprudence. *Id.*. Further, courts must "consider the nature of the litigation and the purposes to be served by the decree" before giving judicial imprimatur. *City of Miami,* 664 F.2d at 441.

Secretary Nelson establishes why the proposed consent judgment does not meet these standards, but, in further support of the Secretary's opposition, it bears emphasizing that Courts must also examine the effect of a consent judgment on third parties. *See Local No. 93, Intern. Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 529-30 (1986); *Bayou Fleet, Inc. v. Alexander*, 234 F.3d 852, 859 (5th Cir. 2000). If a consent judgment would potentially affect third parties, a court must "carefully scrutinize" the judgment to ensure that its effect upon the third parties "is neither unreasonable nor proscribed." *Williams,* 729 F.2d at 1560 (quoting *City of Miami,* 664 F.2d at 441). It is the duty of the court to "safeguard the interests of those individuals who [are] affected by the decree but were not represented in the negotiations." *Id*; *Jones v. Gusman*, 296 F.R.D. 416, 428–29 (E.D. La. 2013).

Here, Amici are representative of millions of Texas voters who would face new barriers to affiliating with their chosen party should the judgment be granted. As more fully set out in Section II of this Brief, overriding the will of the Legislature to eliminate same-day party registration would burden Republican voters in at least two concrete ways. First, particularly for voters with disabilities, it would make it more difficult to participate in their chosen party's primary elections, thus hampering rather than helping their ability to associate. Indeed, due to the immense barriers that would be created to re-register, which would require robust education and outreach efforts, it would likely lead to disenfranchisement from the primary for an untold number of voters during

the early years of implementation. Second, it would discourage overall participation in party politics, which in turn would hurt the party during the general election given that voters who vote in the party's primary are more likely to vote in the general election. It would make it more difficult to attract new voters to the party by adding additional administrative hurdles. This would foreseeably lead to fewer Republican voters overall.

Entry of a consent judgment that implicates third party rights is all the more inappropriate given there is no evidentiary record. Plaintiffs do not explicitly identify whether they are bringing a facial or as-applied challenge; however, their complaint appears to raise an as-applied challenge: "severely burdens the Party's associational rights, and the rights of individual Republicans like Plaintiff Hunt." Compl. at 26 (Doc. 1). Yet in their motion for consent judgment, the parties fail to mention that "[p]roving a severe burden must be done 'as-applied,' with an evidentiary record." *Democratic Party of Hawaii v. Nago*, 982 F. Supp. 2d 1166, 1177 (D. Haw. 2013), *aff'd*, 833 F.3d 1119 (9th Cir. 2016); *see also Ravalli Cnty. Republican Cent. Comm. v. McCulloch*, 154 F. Supp. 3d 1063, 1076 (D. Mont. 2015) ("The Court has no method to measure the burden, if any . . . without proof that such a burden exists."); *cf. Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 455 (2008) ("But these cases involve a facial challenge, and we cannot strike down I–872 on its face based on the mere possibility of voter confusion."). As Secretary Nelson argues in her motion to dismiss, there is no subject matter jurisdiction for this case and Defendants fail to plead adequate factual allegations. But even were this case to proceed, Plaintiffs would have to prove the severity of the alleged burden. If such a record were developed, this Court could then also consider countervailing evidence of Texas's legitimate interests in protecting the associational rights of third-parties such as Amici.

A consent judgment may not be entered if it is unreasonable in light of its foreseeable impact on third parties. *Williams,* 729 F.2d at 1560. Because the proposed consent judgment would burden, rather than bolster, Amici's associational rights and in particular would disproportionately impact Texans with disabilities, this Court should "safeguard" third party interests by denying the motion for entry of a consent judgment. *Id.*

## II. The Legislature's choice of primary system reflects sound policy judgment that is not appropriate for federal court intervention.

"[P]articipation in state-run, state-financed elections . . . is at the heart of this case." *Utah Republican Party*, 892 F.3d at 1078. The Texas Legislature has made a policy judgment that Texas voters and Texas political parties are best served by not forcing voters to pre-register with a party, but rather allowing them to register at the polling place. Far from being arbitrary, the Legislature's choice recognizes that both voters and political parties are benefited by decreasing the administrative burdens of affiliating with the party in advance. Plaintiffs' requested relief would make it harder for voters, particularly those with unique barriers to access, to affiliate with the party at one of the most "important" points—voting in the party's primary. *Clingman v. Beaver*, 544 U.S. 581, 601 (2005) (O'Connor, J., concurring). It would further harm Republican voters and candidates because discouraging voters to affiliate with the party in the primary would lead to fewer voters in the general election. To the extent people might legitimately disagree about the relative merits of widespread participation versus internal party bureaucratic control, those disagreements are policy preferences, not constitutional mandates.

11

### A. Requiring pre-registration would demonstrably burden voters.

It is well established that increasing the costs associated with registering to vote, such as time, effort, paperwork, and early registration deadlines reduces participation.[3] One foundational study found that "[e]arly deadlines for registration and limited registration office hours were the biggest impediments to turnout." Steven J. Rosenstone & Raymond E. Wolfinger, *The Effect of Registration Laws on Voter Turnout*, 72 Am. Pol. Sci. Rev. 22 (1978). While states must balance accessibility with "protect[ing] the integrity and reliability of the electoral process itself," *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 192 (2008), an arbitrary requirement to, for example, register with a party by the second Monday in December, *see* H.B. 951, 89th Leg., Reg. Sess., Tex. (2025), serves no such purpose.

It is already less easy to register to vote in Texas than in other states. *See* Scot Schraufnagel, Michael J. Pomante II & Quan Li, *Cost of Voting in the American States: 2022\**, 21 Election L.J. 220, 224 (2022) (calculating that Texas has the fifth highest "cost of voting index" of all the states). Texas does not provide automatic or online voter registration; rather, every registration must be submitted individually by mail, in person, or through limited agency-based channels. *See generally* TEX. ELEC. CODE § 13.002, ch. 20. Given those restrictions, citizens with disabilities are significantly more likely than citizens without disabilities to register to vote through polling places,

---

[3] *See, e.g.*, ANTHONY DOWNS, ECONOMIC THEORY OF DEMOCRACY 265 (1957) ("[T]ime is the principal cost of voting: time to register, to discover what parties are running, to deliberate, to go to the polls, and to mark the ballot . . . [and] even low voting costs may cause many partisan citizens to abstain."); Elizabeth A. Bennion & David W. Nickerson, *I Will Register and Vote, If You Teach Me How: A Field Experiment Testing Voter Registration in College Classrooms*, 49 PS: Pol. Sci. & Pol. 867 (2016); Céline Braconnier, Jean-Yves Dormagen & Vincent Pons, *Voter Registration Costs and Disenfranchisement: Experimental Evidence from France*, 111 Am. Pol. Sci. Rev. 584 (2017).

government registration offices, public assistance agencies, townhalls, and third-party drives. *See* Schur & Kruse, *Fact Sheet* at 11.

Polling places are, obviously, only open for elections. Thus, the ability to register with a party on the same day as voting serves as a critical means of participation for voters with disabilities who cannot easily travel multiple times to election offices. Eliminating polling place party registration would therefore have a disproportionate effect on voters with disabilities, likely reducing the expansion in voter turnout amongst citizens with disabilities since 2016. *Cf. id.* at 1. Because Texans with disabilities require accessible registration locations, many also utilize Medicaid, SNAP/TANF benefit offices, Aging and Disability Resource Centers (ADRCs) and other local mental health authorities. *Id.* at 11. These centers are required to provide voter registration forms, assistance to complete the forms if requested and submission of the completed form. *See* 52 U.S.C. § 20506(a)(2). Further, many of these centers are specifically equipped to provide the necessary accessibility. However, voters only periodically interact with these agencies, so many would inevitably experience a gap in registration and be unable to participate in one or more primary elections.

Voters residing in group homes, nursing homes, and long-term care facilities—where trained Volunteer Deputy Registrars (VDRs) are rarely present—would be especially affected, as there is no statewide system to ensure compliance training, on-site registration visits, or consistent voter assistance at these facilities. *Cf.* Tex. Elec. Code §§ 13.031–.039. Further, the VDR system itself is fragmented and under-resourced: certification is required county-by-county, VDR trainings can be infrequent, and disability organizations do not have the resources to deploy statewide assistance. Laura Rice, *Why Texas Is the Most Difficult State in the Country to Register Voters*, Texas Standard (Oct. 11, 2016), https://perma.cc/R96K-CJ9Y. Often the default

13

registration materials need to be altered—for example, voters with disabilities might require large-print, plain-language, forms or other assistance or accommodations.

Of course, the increased costs of having to re-register with a party are not exclusive to voters with disabilities. As research suggests, *supra* n.3 and accompanying text, these increased costs would lead to at least some decreased level of participation across the board. Additionally, not only would requiring pre-registration burden many voters' associational rights, but it would actually have adverse impacts on the Texas economy. Research indicates that "there is a statistically significant relationship between earning power over time and voter access." *See* The Perryman Group, *The Potential Economic and Fiscal Impact of Closing Primaries in Texas* (Oct. 2025), https://perma.cc/JD48-V69K. In particular, "decreases in voting access lead to lower earnings over time," which then "affect household budgets and therefore consumer spending" and ripple through the economy via multiplier effects. *Id.* at 2.

**B.  *Requiring pre-registration would discourage potential Republican voters and harm those voters who currently affiliate with the Party.***

Instituting new hurdles for voting in the Republican primary would harm the party overall. Voting in a primary serves the "basic function" of a political party, which is to "select the candidates for public office to be offered to the voters at general elections." *Kusper*, 414 U.S. at 58. Requiring voters to pre-register with a party months in advance predictably shrinks the primary electorate, dampening enthusiasm at the very point when campaigns identify supporters, recruit volunteers, and convert primary voters into consistent general-election voters.

Research has shown that voting is "habit forming." In other words, "voting in one election substantially increases the likelihood of voting in the future. Indeed, the influence of past voting exceeds the effects of age and education reported in previous studies." Alan S. Gerber, Donald P. Green & Ron Shachar, *Voting May Be Habit-Forming: Evidence from a Randomized Field*

14

*Experiment*, 47 Am. J. Pol. Sci. 540, 540–41 (2003); *see also Alexander Coppock & Donald P. Green, Is Voting Habit Forming? New Evidence from Experiments and Regression Discontinuities*, 60 Am. J. Pol. Sci. 1044 (2016) (documenting persistent downstream effects of initial participation). And recent work likewise finds that first voting experiences increase subsequent participation—especially in elections of the same type—consistent with habit-formation theory. *See* Elias Dinas et al., *Early Voting Experiences and Habit Formation*, 12 Pol. Sci. Res. & Methods 195, 195–96 (2024). Voting patterns in Texas support this premise—in particular voters who turnout in the GOP primary are far more likely to also vote in November: in Texas's 2018 general election, roughly 84% of registered voters with a prior Republican-primary history cast a ballot, compared to about 54% of voters with no primary history and about 20% of registrants with no prior voting history at all. Ryan Data & Research, *2018 General Election Analysis*, Dallas Observer (Jan. 3, 2019), https://perma.cc/9U52-5UDA. Disincentivizing participation in the Republican Primary would therefore break the "habit" of showing up to the polls to vote for Republican candidates. The Party should be encouraging consistent party affiliation, not creating new barriers to it.

Making participation in its primary more difficult would hurt the Party's standing with existing voters. For example, historically, voters with disabilities are a politically mixed group. *See, e.g.,* Nat'l Disability Rights Network, *Findings from 2020 Election Omnibus Survey* (2020), https://perma.cc/36UE-A7DT ("51% of voters with disabilities supported President Donald Trump, while 47% backed President-elect Joe Biden."). If one party were to discourage voters with disabilities from participating in its primary, it would likely negatively impact that party's standing overall with the community.

Additionally, imposing a pre-registration requirement would hurt the Party's ability to attract new voters and translate them into consistent GOP voters. Voters like the individual Amici want to exercise their right to affiliate with the Republican Party at the ballot box when it matters most—the primary—but they reasonably prefer not to have to pre-register months in advance. As Ms. Gibbud's decades of voter-registration experience confirm, these voters are hardly an anomaly; many eligible Texans are uncomfortable being required to choose a party at the time of initial registration and would be discouraged from registering—or participating—if forced to do so. Along these lines, the Republican Party has increasingly made inroads with Latino communities in Texas, which traditionally were viewed as Democratic voting blocks. Indeed, Texas Legislative Council data shows that Spanish-surnamed voter participation in the Republican Primary in the South-Texas based Congressional District 34 increased from 28.7% of the voters in 2016 to 36.5% of the voters in 2024.[4] This is at least in part due to the Republican Party's conscious efforts to connect with the Latino community.[5] Erecting additional barriers for new voters to affiliate with the Republican Party would predictably undermine those efforts and hinder the Party's momentum.

## CONCLUSION

The State of Texas has an important interest in "encourag[ing] citizen participation in the democratic process." *Crawford*, 553 U.S. at 197; *see also Democratic Party of U. S.*, 450 U.S. at

---

[4] *Compare* Tex. Legis. Council, *Population, Voter Registration, Turnout, and SSTO Analysis: Congressional Districts–2016 Republican Primary Election Report PLANC2333_R237* (Aug. 18, 2025), https://perma.cc/N5GM-5BXV *with* Tex. Legis. Council, *Population, Voter Registration, Turnout, and SSTO Analysis: Congressional Districts–2024 Republican Primary Election Report PLANC2333_R237* (Aug. 18, 2025), https://perma.cc/DGE3-YFUS.

[5] *See, e.g.*, Berenice Garcia, *RNC Opens Hispanic Community Center in McAllen*, MyRGV (Oct. 5, 2021), https://perma.cc/HQ5D-JHBV.
.

124–25 (noting the State's interest in "increasing voter participation in primaries"); *Greenville Cnty. Republican Party Executive Comm. v. South Carolina*, 824 F. Supp. 2d 655, 671 (D.S.C. 2011) ("States have an important interest in promoting voter participation in the electoral process."). Amici need not contend that, were the Texas Legislature to amend the law to require party pre-registration, it would represent an unconstitutional burden on their associational rights to vote in the primary. *But see Clingman*, 544 U.S. at 601 (O'Connor, J., concurring) ("The act of casting a ballot in a given primary may . . . constitute a form of association that is at least as important as the act of registering."). Nevertheless, Amici's interest in maintaining polling place party registration illustrates why this issue should be decided by Texans through their elected representatives, rather than by a federal court. At a minimum, the impact of this issue on third parties precludes disposition by consent decree.

November 10, 2025                           Respectfully submitted,

                                            */s/ Mimi Marziani*
                                            **Mimi Marziani**
                                            **Joaquin Gonzalez**
                                            **Rebecca (Beth) Stevens**
                                            **MARZIANI, STEVENS & GONZALEZ PLLC**
                                            500 W. 2nd Street, Suite 1900
                                            Austin, TX 78701
                                            (210) 343-5604
                                            mmarziani@msgpllc.com
                                            jgonzalez@msgpllc.com
                                            bstevens@msgpllc.com

                                            **COUNSEL FOR AMICI CURIAE**

17

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing has been served on all counsel record who have appeared in this matter through the ECF electronic service system on November 10, 2025, via the Court's CM/ECF system.

*/s/ Mimi Marziani*
Mimi Marziani