**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

CHIP HUNT; REPUBLICAN PARTY OF TEXAS,

*Plaintiffs*,

v.

STATE OF TEXAS; JANE NELSON, in her official capacity as Texas Secretary of State,

*Defendants*.

Civil Action No. 2:25-cv-200

# PLAINTIFFS' OPPOSITION TO DEFENDANT SECRETARY OF STATE JANE NELSON'S MOTION TO DISMISS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... iii
INTRODUCTION .......... 1
BACKGROUND .......... 3
ARGUMENT .......... 6
I. The Court has Jurisdiction Over This Action. .......... 6
 A. Plaintiffs Have Standing. .......... 6
 B. Plaintiffs' Claim is Ripe. .......... 10
II. Secretary Nelson and Her Out-of-State Private Counsel May Not Assert the State of Texas's Sovereign Immunity. .......... 14
III. Plaintiffs Have Plausibly Pleaded That Texas's Open-Primary System Violates Their First Amendment Rights .......... 16
 A. The Election Code Imposes a Severe Burden on Plaintiffs' Associational Rights. .......... 16
 B. The Texas Election Code Does Not Survive Strict Scrutiny .......... 24
CONCLUSION .......... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Meyers ex rel. Benzing v. Texas*,
410 F.3d 236 (5th Cir. 2005) ....................15

*Bergmann v. Mich. State Transp. Comm'n*,
665 F.3d 681 (6th Cir. 2011) ....................15

*Boudreaux v. La. State Bar Ass'n*,
3 F.4th 748 (5th Cir. 2021) ....................21, 23

*Boy Scouts of Am. v. Dale*,
530 U.S. 640 (2000)....................19

*Cal. Democratic Party v. Jones*,
530 U.S. 567 (2000)....................1, 2, 3, 7, 16, 17, 18, 19, 21, 22, 23, 24

*Cal. Democratic Party v. Jones*,
984 F. Supp. 1288 (E.D. Cal. 1997)....................23

*Cent. & S. W. Servs. v. EPA*,
220 F.3d 683 (5th Cir. 2000) ....................13

*Clingman v. Beaver*,
544 U.S. 581 (2005)....................19, 20

*Democratic Party of Hawaii v. Nago*,
833 F.3d 1119 (9th Cir. 2016) ....................22, 23, 24

*Democratic Party of U.S. v. Wisc. ex rel. La Follette*,
450 U.S. 107 (1981)....................8, 16, 17, 18, 19, 23

*DM Arbor Ct., Ltd. v. City of Houston*,
988 F.3d 215 (5th Cir. 2021) ....................11

*Edelman v. Jordan*,
415 U.S. 651 (1974)....................14

*Ford Motor Co. v. Dep't of Treasury*,
323 U.S. 459 (1945)....................15

*Free Speech Coal., Inc. v. Paxton*,
606 U.S. 461 (2025)....................24

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010)....................24

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
515 U.S. 557 (1995)....................19

*Idaho Republican Party v. Ysursa*,
765 F. Supp. 2d 1266 (D. Idaho 2011) ....................7, 13, 16, 18, 21, 25

*Inst. for Free Speech v. Johnson*,
148 F.4th 318 (5th Cir. 2025) ....................11, 12

*Lapides v. Bd. of Regents of Univ. Sys. of Ga.*,
535 U.S. 612 (2002)....................15

*Levy v. Off. of Legis. Auditor*,
362 F. Supp. 2d 729 (M.D. La. 2005)....................15

*Magnolia Venture Cap. Corp. v. Prudential Sec., Inc.*,
151 F.3d 439 (5th Cir. 1998) ....................15

*MedImmune, Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007)....................10

*Miller v. Brown*,
462 F.3d 312 (4th Cir. 2006) ....................6, 7

*Miss. State Democratic Party v. Barbour*,
529 F.3d 538 (5th Cir. 2008) ....................9, 10

*Nat'l Org. for Marriage, Inc. v. Walsh*,
714 F.3d 682 (2d Cir. 2013)....................10

*Neese v. Becerra*,
2022 WL 1265925 (N.D. Tex. Apr. 26, 2022) ....................11, 13

*Patsy v. Bd. of Regents of State of Fla.*,
457 U.S. 496 (1982)....................14

*Shelby County, Ala. v. Holder*,
570 U.S. 529 (2013)....................10

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014)....................10, 13

*Sweezy v. New Hampshire*,
354 U.S. 234 (1957)....................8

*Tashjian v. Republican Party of Conn.*,
479 U.S. 208 (1986) .......... 3, 20, 23

*Tex. Tribune v. Caldwell Cnty.*,
121 F.4th 520 (5th Cir. 2024) .......... 6

*Texas v. United States*,
497 F.3d 491 (5th Cir. 2007) .......... 11

*Umphress v. Hall*,
133 F.4th 455 (5th Cir. 2025) .......... 12, 13

*United States v. Gov't of Virgin Islands*,
363 F.3d 276 (3d Cir. 2004) .......... 15

*Wash. State Grange v. Wash. State Republican Party*,
552 U.S. 442 (2008) .......... 12

*Wisc. Dep't of Corrs. v. Schacht*,
524 U.S. 381 (1998) .......... 14

*Wise v. Lipscomb*,
437 U.S. 535 (1978) .......... 12

**Legislation and Rules**

Republican Party of Texas Rule 46 .......... 1, 4, 5, 6, 8, 9, 12, 13, 18, 23, 24, 25

S.B. 1, 89th Leg., R.S., at IX-76, § 16.01(a)(1) (May 21, 2025),
https://perma.cc/7TBE-Q7G9 .......... 14

Tex. Election Code § 13.143 .......... 12

Tex. Election Code § 162.002 .......... 3, 17

Tex. Election Code § 162.003 .......... 3, 17

Tex. Election Code § 162.003-.008 .......... 22

Tex. Election Code § 162.012 .......... 17, 22

Tex. Election Code § 162.014 .......... 22

Tex. Election Code § 172.001 .......... 3

Tex. Election Code § 172.002 .......... 3

Tex. Election Code § 172.086 .......... 17

Tex. Election Code § 172.125 ........................................ 17

**Other Authorities**

U.S. Const. amend. I ........................................ 1, 2, 3, 6, 9, 11, 13, 16, 18, 19, 20, 24

U.S. Const. amend. XI ........................................ 14, 15

**INTRODUCTION**

The First Amendment protects the Republican Party of Texas's (the "Party") associational freedom to "identify the people who constitute" the Party, and to "limit" the Party's membership to "those people only." *Cal. Democratic Party v. Jones*, 530 U.S. 567, 574 (2000). The Party seeks to exercise that right by conducting closed primary elections in which only those voters who qualify as Republicans under Republican Party of Texas Rule 46 can vote in a Party primary. Yet Texas law overrides that judgment, telling the Party that a 'Republican' is simply anyone who shows up on election day and asks for a Republican ballot. That is unconstitutional. As the Supreme Court has repeatedly held, forcing a political party to associate with non-members in selecting its nominees severely burdens First Amendment rights and triggers strict scrutiny—a test the State cannot meet.

The Secretary of State, and *not* the State of Texas, has moved to dismiss for lack of jurisdiction and failure to state a claim, *see* ECF 30, 30-1, but each of her arguments fails.

As an initial matter, Plaintiffs have Article III standing. Forcing a political party to associate with members of another party when choosing its nominees is a recognized constitutional injury. That injury here is caused by Secretary Nelson's enforcement of Texas's open-primary provisions. And Plaintiffs' requested declaratory and injunctive relief would redress this injury by enabling the Party to implement closed primaries itself or through the Texas Legislature. Plaintiffs' claim is ripe for essentially the same reason: There is an active and concrete dispute as to whether the Secretary can force the Party to ignore its own rules and select candidates according to Texas's open primary provisions. The Secretary disputes this Court's jurisdiction because she asserts that the Party "has not adopted a permanent closed-primary rule." ECF 30-1 at 14. But this is wholly mistaken. The Party has both a permanent version of Rule 46 requiring closed primaries *and* an emergency temporary version that accomplishes the same goal through a more streamlined registration process. The Party's constitutional injury from having to conduct open primaries is therefore not speculative and Plaintiffs' claims are ripe.

This Court likewise has jurisdiction over Plaintiffs' claim *against the State of Texas*. Secretary Nelson asserts that this Court should dismiss Plaintiffs' claim against the State because the State has sovereign immunity. But Secretary Nelson and her out-of-state counsel do not represent the State of Texas. She thus cannot assert the defense of sovereign immunity on the State's behalf. Nor can this Court invoke the State's immunity *sua sponte*, especially since the State has chosen to affirmatively waive that defense by seeking a judgment from this Court declaring Texas's open-primary system unconstitutional.

Plaintiffs have stated a claim against the Secretary on the merits. The Supreme Court has held that a party's associational rights are severely burdened by the forced participation of non-party members in the party's primary. *Jones*, 530 U.S. at 581-82. This is because even "a single election in which the party nominee is selected by nonparty members could be enough to destroy the party." *Id.* at 579. Plaintiffs allege that Texas's open-primary laws force the Party to associate with non-Republican voters to choose its nominees and that these voters—called crossover voters—not only exist in relatively large numbers but have cast the deciding votes in multiple Texas primary elections. ECF 1 ¶¶ 44-56 ("Compl."). That is a severe burden. And the State offers no compelling interest that would justify forcing the Party to open its primaries to Democrats and independents who can strategically influence or sabotage the Party's nominee selection. Nor has it shown that Texas's open-primary system is narrowly tailored to that compelling interest.

Secretary Nelson argues that an open primary does not severely burden the Party (and so is not subject to strict scrutiny) because Texas law says that anyone who votes in the Republican primary is, by definition, a Republican. But it is bedrock First Amendment law that a state does not get to define who is a member of a political party—the party does. She also disputes the prevalence of crossover voting, professing shock that Democrats and independents will temporarily "affiliate" with the Republican party to strategically vote in the Republican primary. But this case is at the motion to dismiss stage, so Plaintiffs' plausibly pled allegations of crossover voting must be taken as true.

The Court should deny Secretary Nelson's motion to dismiss.

## BACKGROUND

Although the Constitution grants the States "a broad power to prescribe the 'Times, Places and Manner of holding Elections" for state offices, that "authority does not extinguish the State's responsibility to observe the limits established by the First Amendment," and therefore "does not justify" the abridgment of "the freedom of political association." *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986) (cleaned up). Accordingly, where State laws force "political parties to associate" with "those who, at best, have refused to affiliate with the party, and, at worst, have expressly affiliated with a rival," they severely burden a party's First Amendment rights. *Jones*, 530 U.S. at 577. And courts strike down such laws unless they can survive strict scrutiny. *See id.* at 582.

The Election Code permits any registered voter to 'affiliate' with a party by showing up on election day and voting in its primary. Compl. ¶ 15 (citing Tex. Election Code §§ 162.002, 162.003, 172.001, 172.002). Secretary Nelson, who is responsible for implementing and enforcing those provisions, *id.* ¶¶ 13, 22, has therefore informed voters that they are "not required to pre-register or take any steps towards affiliating themselves with a party before voting in a party's primary election," *id.* ¶ 16 (citation omitted). By voting in a party's primary, the voter 'affiliates' with that party under State law, meaning that they may not vote in another party's primary (or runoff). *Id.* ¶ 20. But that restriction means very little because it "automatically terminates at the end of each voting year." *Id.*

The Election Code's primary provisions together with the prevailing political conditions in Texas make crossover voting—where voters who align with one party (or no party at all) vote in the Republican Party primary, *id.* ¶ 2 n.1—"rampant" in the State, *id.*¶ 44. As academics and courts have acknowledged, this kind of voting behavior is common nationwide. *Id.* ¶¶ 34-38. And it is especially prominent in "one-party" States like Texas, *id.* ¶ 39, where Republicans have dominated "elections and state offices for the past several decades," *id.* ¶ 52. That's because in Texas, the Party's primaries are usually the "only game in town," meaning that non-Republican voters must cross over "in order to have any meaningful influence in elections." *Id.* ¶ 39 (citation omitted).

Two recent elections demonstrate how crossover voting affects the Party's primaries. In the 2024 Speaker of the House primary runoff, the "moderate" candidate—whom Democrats and independents were more likely to support—won the election by an exceedingly narrow margin: 389 votes out of the 25,000 cast. *Id.* ¶ 47. And the Party identified that "nearly 9% of the voters" in that election "were known Democrats." *Id.* ¶ 51. In a separate Party primary—the winner of which would run uncontested in the general election since the Democrats did not put up a candidate—the winner grossed only 763 more votes than his opponent, out of 30,000 cast. *Id.* ¶ 48. Against the backdrop of these closely contested primaries, the Democratic party has at times encouraged its party members to vote in the Party's primaries. *Id.*¶ 49.

Recognizing the threat posed by crossover voting to the Party's message and purpose, Party members soon "demanded action." *Id.* ¶ 57 (alteration omitted). Those members, including Plaintiff Hunt, made clear to the Party that "only Republicans should pick Republican nominees" because that "protect[s] [the Party's] platform . . . values . . . and [] future." *Id.* ¶¶ 57-58 (alteration omitted). As a result, the Party "overwhelming[ly]" adopted the first version of Rule 46 in 2024. *Id.* ¶ 60. That version of Rule 46 became permanent in January 2025, *see* Ex. A at 41 (setting out the original Rule 46 and providing that it would take effect on "January 1 of the odd-numbered year" following the convention, *i.e.*, 2025), and limits the ability to vote in Republican primaries to voters who (1) "voted in the previous Republican primary or primary runoff election"; (2) are "registered as a Republican"; (3) "submitted a certificate of affiliation" with the Party no later than the first day on which a candidate may for a place on the general primary election ballot; or (4) are "voting in his or her first primary election" and are "under the age of 21," Compl. ¶ 61 (cleaned up); Ex. A at 41. The Rule also provides that it "supersedes any other rule or law of the State of Texas." Ex. A at 41.

The Party later adopted a temporary and emergency version of Rule 46 in June 2025 that similarly closes the primaries but simplifies who may vote in the Republican primary. Compl. ¶¶ 62-63. This version of Rule 46 states that "only a United States citizen eligible to vote in Texas who is registered to vote with the Texas Secretary of State as a Republican may cast a ballot in" a

Republican primary. *Id.* ¶ 63. This version of Rule 46 is currently in effect and will become permanent in January 2027 if it is ratified by the delegates at the biannual state convention. If it is not ratified for some reason, Rule 46 will revert to the permanent version that became effective in 2025. Ex. A at 41. Accordingly, the Party's rules currently require closed primaries and will continue to require closed primaries, regardless of whether the current version of Rule 46 becomes permanent.

After the Party adopted Rule 46, it notified Secretary Nelson. *See id.* ¶ 70; ECF 1-1. Yet despite Rule 46 defining Party "membership more restrictively than Texas law's current 'affiliation' standard," Compl. ¶ 64, Secretary Nelson indicated that she would continue to enforce the current primary provisions, and "indicated that she will not place the Party's nominees on the general election ballot" unless they are chosen "in accordance with the open-primary process . . . required by the Texas Election Code." *Id.* ¶ 73.

The Party therefore found itself faced with two losing choices. One the one hand, it could refrain from exercising its associational right to require voters to join the Party pursuant to Rule 46 before voting in its primaries. On the other, it could attempt to close its primaries according to Rule 46's requirements, and risk not only Secretary Nelson's refusal to place its nominees on the general election ballot, *id.* ¶ 73, but also potential enforcement actions and mandamus suits by Secretary Nelson and the State, *id.* ¶¶ 26-27.

Accordingly, the Party brought this action, claiming that the primary provisions of the Election Code violate its associational rights. *Id.* ¶¶ 80-89. For relief, the Party seeks a declaration that the primary provisions are unconstitutional as applied to the Party, as well as an injunction prohibiting Defendants from enforcing the primary provisions against the Party. *Id.* ¶¶ 90-91. Shortly after the Party filed its Complaint, Plaintiffs together with the State filed a joint motion for consent judgment, in which the State acknowledged the unconstitutionality of the primary provisions. *See* ECF 27.

Secretary Nelson has now moved to dismiss Plaintiffs' claims. ECF Nos. 30, 30-1.

## ARGUMENT

The Court should deny Secretary Nelson's motion to dismiss for three reasons. *First*, Plaintiffs have standing and this case is ripe because there is a live and concrete dispute as to whether the Party can close its primaries as Rule 46 requires. *Second*, Secretary Nelson has no basis to assert a sovereign immunity defense on behalf of the State, which is represented by the Attorney General and has affirmatively waived that defense by asking this Court to enter a judgment. *Third*, Plaintiffs have plausibly alleged that Texas's open-primary system violates their First Amendment associational rights because it forces the Party to allow non-Party members to select Republican party nominees.

### I. The Court has Jurisdiction Over This Action.

#### A. Plaintiffs Have Standing.

Plaintiffs have standing because Defendants enforce provisions of the Texas Election Code that prevent Plaintiffs from exercising their First Amendment rights. Secretary Nelson attempts to avoid this obvious basis for standing by asserting that the Party has not changed its rules and then speculating that this shows the Party does not really intend to close its primary. This is baseless. The Party adopted Rule 46 to implement closed primaries and has alleged its intent to hold closed primaries when Defendants no longer prohibits it from doing so. If Secretary Nelson wants to challenge the sincerity of the Party's commitment to closing its primary, she should attempt that feat at summary judgment, not the pleading stage.

**1.** To establish Article III standing, a plaintiff must allege (1) an injury in fact, (2) a causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision. *See Tex. Tribune v. Caldwell County*, 121 F.4th 520, 526 (5th Cir. 2024). Plaintiffs have alleged each.

To start, "[t]he allegation of having to associate with members of the other party during their candidate-selection processes unquestionably pleads a constitutional injury." *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006). The Complaint in this case specifically alleges that, despite Rule

46, Texas law "requires the Party instead to nominate candidates through an open-primary system that allows non-Republicans, including independent voters and Democrat voters, to vote in Republican primary elections." Compl. ¶ 84. Plaintiffs' "alleged constitutional injuries are not conjectural or hypothetical" because "[t]he participation of Democrats in the plaintiffs' upcoming primary is inevitable." *Miller*, 462 F.3d at 317; *see, e.g.*, Compl. ¶ 44 ("Crossover voting is rampant in Texas.").

Secretary Nelson has not challenged traceability, but it is similarly easy. "The mere existence of the open-primary law causes these decisions to be made differently than they would absent the law, thus meeting the standing inquiry's second requirement of a causal connection between the plaintiffs' injuries and the law they challenge." *Miller*, 462 F.3d at 318. Secretary Nelson is responsible for enforcing Texas's unconstitutional law. *See* Compl. ¶ 13 ("As Secretary of State, Defendant Nelson is responsible for enforcing the Texas Election Code provisions regarding primary elections at issue in this case[.]"). And she "has indicated that she will" continue to enforce that unconstitutional law by refusing to "place the Party's nominees on the general election ballot unless those nominees are chosen in accordance with the open-primary process unconstitutionally required by the Texas Election Code." *Id.* ¶ 73.

Lastly, declaratory and injunctive relief would redress Plaintiffs' injuries because "[a] favorable court decision in this case would allow the plaintiffs to exclude Democrats from participating in their primary and thus eliminate their alleged injuries." *Miller*, 462 F.3d at 318; *see* Compl. ¶ 78 (alleging that "taking the steps to transition to closed primaries without legislation is not feasible unless and until this Court issues relief declaring the Party's rights"). Courts accordingly and routinely reach the merits in cases like this one. *See, e.g.*, *Jones*, 530 U.S. at 586 (holding unconstitutional a California law "forcing political parties to associate with those who do not share their beliefs"); *Idaho Republican Party v. Ysursa*, 765 F. Supp. 2d 1266, 1268 (D. Idaho 2011) ("[B]y mandating [an open-primary] nomination process, the State violates the Party's constitutionally guaranteed right to freedom of association.").

What is more, standing extends beyond the party itself to its adherents, including Plaintiff Hunt. *See* Compl. ¶ 85 (alleging that Defendants' conduct "severely burdens . . . the rights of individual Republicans like Plaintiff Hunt"). Secretary Nelson doubts Plaintiff Hunt's injury in fact, *see* ECF 30-1 at 23, but the Supreme Court has been clear: "Any interference with the freedom of a party is simultaneously an interference with the freedom of its adherents." *Democratic Party of U.S. v. Wisc. ex rel. La Follette*, 450 U.S. 107, 122 (1981) (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957)). Plaintiff Hunt does not want to associate with non-Republicans to select the Republican nominee. *See* Compl. ¶¶ 45, 58, 60. Secretary Nelson's enforcement of an unconstitutional law "severely burdens . . . the rights of individual Republicans like Plaintiff Hunt, because many non-Republicans take advantage of this open-primary system and vote strategically in Republican primary elections." *Id.* ¶ 85.

**2.** The Secretary's entire argument against standing rests on a misunderstanding of the facts Plaintiffs have alleged. The Secretary repeatedly asserts that the Party "has not adopted a permanent closed-primary rule." ECF 30-1 at 14. That is incorrect. The Party adopted Rule 46 at the Party's biennial convention in 2024. Compl. ¶¶ 60-61. It then became permanent in January 2025. *See* Ex. A at 41 (setting out that the Rule took effect in 2025); *see* ECF 30-1 at 14-15 (describing same). The Party later changed Rule 46 in the summer of 2025 on an emergency and temporary basis to alter the specific ways in which individuals may affiliate with the Party for purposes of being eligible to vote in a closed primary. Compl. ¶¶ 62-63. And that current version of Rule 46 either will become permanent in January 2027 if ratified by the convention, or will expire such that the Party rules revert to the prior, permanent version of Rule 46. Either way, the Party has a permanent rule closing the Party's primaries.

Because either version of Rule 46 closes the Party's primaries, the Secretary has no basis to argue that an injury caused by a conflict between the Party rule and the Texas Election Code is "speculative." ECF 30-1 at 16. There is constitutional injury under either version, as both versions close the Republican primary in a way that directly conflicts with the Election Code. Likewise, because Rule 46 is currently in place, the Secretary's redressability argument fails. The Secretary

argues that any associational harm would not be redressed because "the Party lacks a closed-primary rule, meaning it would still associate with unwanted voters even if it wins." *Id.* at 16. In fact—as Plaintiffs have alleged—relief from this Court would immediately allow Plaintiffs to implement Rule 46, whether under the current version of Rule 46 or the permanent version if the current version is not made permanent.

Secretary Nelson's reliance on *Barbour* does not help her. *See id.* at 16-17. To begin, *Barbour* supports the Party's standing at this pleading stage. The Fifth Circuit recognized that "[t]he party unquestionably pleaded a constitutional injury by alleging that Mississippi's semi-closed primary statute requires it to associate with members of the other party during its candidate-selection process." *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 545 (5th Cir. 2008). But the *Barbour* district court did more than deny a motion to dismiss. It granted a preliminary injunction, which requires evidence, not just allegations, of standing. That is why the Fifth Circuit went on to discuss how "prov[ing] standing to raise a First Amendment facial challenge" requires "produc[ing] evidence of 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute.'" *Id.*

In *Barbour*, the Democratic Party had "taken no steps to authorize the party to conduct closed primaries." *Id.* It had not "plac[ed] the policy up for a party-wide vote" or "adopted any policies to exclude voters not registered as Democrats from its primary." *Id.* It had "provided no affidavit evidence that it intends to do so." *Id.* On the contrary it had a "liberal membership policy" and "never pursued to completion its attempt to preclear with the DOJ any proposed change to a closed primary." *Id.*

This case is precisely the opposite. The Party has taken numerous steps to close its primary. The issue was the subject of a party-wide vote in 2024, and "[t]he results overwhelmingly supported closing the primary." Compl. ¶ 59. The Party has adopted a rule closing its primary not once but twice. *Id.* ¶¶ 60-64. The Party has specifically alleged its intention to close its primary: "[T]he Party can and will transition to closed primaries for future election cycles even without legislation." *Id.* ¶ 75. Secretary Nelson's quibbling about effective dates does nothing to undermine

these allegations of "the party's intention to effectuate a closed primary." *Barbour*, 529 F.3d at 545. Nor do the "liberal membership policy," *id.*, and preclearance considerations from *Barbour* apply here, *see Shelby County, Ala. v. Holder*, 570 U.S. 529, 557 (2013).

Lastly, Secretary Nelson speculates based on her misunderstanding of the Party's rules that the Party will not actually implement its closed-primary rule even if it secures judicial relief. *See* ECF 30-1 at 16. That is baseless. Although "the Party strongly prefers that the Legislature implement closed Republican primaries through a system in which the Secretary maintains lists of registered Republican voters," "even without legislation," "the Party can and will transition to closed primaries for future election cycles." Compl. ¶ 75. The Complaint specifically details what the Party would do with judicial relief absent legislation. *See id.* ¶¶ 76-79.

Secretary Nelson's doubts about the Party's commitment to closing its primary is nothing more than speculation on her part. She cannot challenge the truthfulness of Plaintiffs' allegations at this stage.

**B. Plaintiffs' Claim is Ripe.**

The Secretary's ripeness attack fares no better than her standing attack because in cases like this one "standing and ripeness issues . . . 'boil down to the same question.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 n.5 (2014) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128, n. 8 (2007). As the Fifth Circuit remarked in *Barbour*, "the standing and ripeness issues both turn on whether the [political party's] alleged [associational] injury is actual or imminent rather than conjectural or hypothetical." 529 F.3d at 545; *see also Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013) ("[T]o say a plaintiff's claim is constitutionally unripe is to say the plaintiff's claimed injury, if any, is not 'actual or imminent,' but instead 'conjectural or hypothetical.'" (cleaned up)). For all the reasons explained above, Plaintiffs have alleged an actual and imminent injury because the Party is required to allow Democrats and independents to decide the Party's nominees. Their claim is therefore ripe.

Even if this Court applies the two-step ripeness analysis "out of an abundance of caution," *Inst. for Free Speech v. Johnson*, 148 F.4th 318, 331 (5th Cir. 2025), the result is the same. A claim is ripe under this analysis when (1) the issues are "fit" for "judicial decision," and (2) there is "hardship to the parties of withholding court consideration." *Neese v. Becerra*, 2022 WL 1265925, at *8 (N.D. Tex. Apr. 26, 2022) (Kacsmaryk, J.) (citing *Texas v. United States*, 497 F.3d 491, 498 (5th Cir. 2007)). Both requirements are easily met.

The issue here—whether Texas's open-primary system violates Plaintiffs' First Amendment associational rights—is fit for judicial decision because it is a "legal" question. *Inst. for Free Speech*, 148 F.4th at 331. The Secretary does not really dispute that the constitutionality of Texas's open-primary system is a legal one but instead argues that further factual development is necessary to determine "whether the Party will adopt a permanent closed-primary policy" and, if so, what the Party's closed primary policy will be. ECF 30-1 at 18-19. But no factual development is needed[1] because the Party *has* adopted a closed primary rule, and both versions of that rule conflict with the Texas Election Code: They require voters to associate themselves with the Party *before* the primary election to cast a ballot, whereas Texas law authorizes individuals to vote in the Republican primary if they simply show up and ask for a Republican ballot.

The Secretary also argues that Plaintiffs' claim is not fit for review because the Party has not resolved every aspect of how a closed primary system will operate. *Id.* But a court need not "wait and see precisely how [the Party's] political activities will develop before evaluating [its] First Amendment claim[.]" *Inst. for Free Speech*, 148 F.4th at 332 (cleaned up). That is because, regardless of how exactly the Party will fill in the details down the road, *any* implementation of the Party's rules conflicts with Texas's unconstitutional law. The legal issue presented to this Court

[1] To be clear, factual development in this context means waiting for additional events to occur so that a dispute is not "premature or speculative." *DM Arbor Ct., Ltd. v. City of Houston*, 988 F.3d 215, 218 (5th Cir. 2021). This is different from the term factual development as it is sometimes used to refer to resolving factual disputes in the course of litigation. The need to resolve factual disputes—for example, here, the extent of crossover voting in Texas—is the bread and butter of trial litigation and does not implicate ripeness.

therefore "will not be clarified by further factual development." *Umphress v. Hall*, 133 F.4th 455, 468 (5th Cir. 2025); *cf. Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 455 (2008) (cited at ECF 30-1 at 21) (rejecting facial challenge to primary election law because the Court could imagine constitutional implementations of that law). The Secretary seeks to undermine this conclusion by speculating that maybe the Party would implement a "closed-primary system [that] allows voters to officially register as a Republican or Democrat on the same day as the election," and that this would alter the "severity of the associational burden." ECF 30-1 at 19-20. But this speculation directly contradicts both versions of Rule 46, the Party's intent to close its primary, and unchallenged state law requiring voters to register at least 30 days before an election. Tex. Election Code § 13.143.

The Secretary's questions about how soon the Party will implement closed primaries if the Legislature declines to do so also do not affect ripeness. ECF 30-1 at 19. A claim is ripe and no further factual development is necessary so long as the complaint alleges that the party "has an intention to engage" in "conduct that is . . . prohibited" by state law. *Inst. for Free Speech*, 148 F.4th at 332. Plaintiffs have alleged not only the Party's intent to implement closed primaries, *see* Compl. ¶¶ 75-76, but have backed it up with rules, *see id.* at 22-24, ¶¶ 70-74, and (unsuccessful) attempts to convince Secretary Nelson to close the Republican primary, *see id.* at 22-24, ¶¶ 70-74. Questions about how long implementation will take are nothing more than a premature attack on the sincerity of the Party's assertions.

Notwithstanding the Secretary's insinuations to the contrary, *see* ECF 30-1 at 18-19, there is nothing unusual, much less jurisdictionally problematic, about giving the Legislature the first opportunity to remedy a constitutional violation in an election case. *See, e.g.*, *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978) ("When a federal court declares an existing apportionment scheme unconstitutional, it is therefore, appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan."); Compl. ¶ 5

(explaining "other States . . . have remedied similar constitutional violations by passing legislation, including in response to a court declaration").

Because the issue is fit for review, Plaintiffs need only show "'some hardship in order to establish ripeness.'" *Neese*, 2022 WL 1265925, at *8 (quoting *Cent. & S. W. Servs. v. EPA*, 220 F.3d 683, 690 (5th Cir. 2000)). Here, the hardship from delayed review is as obvious as it is substantial: The Party must continue holding open primaries that violate its associational rights, and Hunt must continue associating with non-Republicans to choose Republican candidates for the general election. *See Susan B. Anthony List*, 573 U.S. at 167-68 ("[D]enying prompt judicial review would impose a substantial hardship on petitioners, forcing them to choose between refraining from core political speech on the one hand or engaging in that speech and risking costly Commission proceedings and criminal prosecution on the other."); *Umphress*, 133 F.4th at 468 (finding claim ripe where the plaintiff would be forced "to choose between refraining from speech, expressive conduct, and religious exercise" or "engaging in those activities and risking Commission proceedings" (cleaned up)). The Secretary responds that continuing to force the Party to use open primaries is not a hardship because the open-primary system violates Plaintiffs' First Amendment rights for their own good. *See* ECF 30-1 at 20 (asserting there is no hardship because the Republican Party has had electoral success with open primaries). But the Secretary does not get to decide whether open primaries or closed primaries are better for the Republican Party.

In short, Plaintiffs' claim is ripe. The Party has alleged its intent to hold closed primaries in which voters must register as Republicans before election day, has acted on that intent by enacting Rule 46, yet cannot implement closed primaries because the Secretary continues to enforce Texas law requiring open primaries. Courts have routinely reached the merits in these circumstances because the First Amendment issue is clearly presented. *See, e.g.*, *See Ysursa*, 765 F. Supp. 3d at 1270, 1277 (adjudicating merits based on the Republican Party's closed-primary rule, even though the party had not set forth a detailed plan for implementing it). This case should be no different.

## II. Secretary Nelson and Her Out-of-State Private Counsel May Not Assert the State of Texas's Sovereign Immunity.

Secretary Nelson next argues that Plaintiffs' claims against *the State* must be dismissed because the "[t]he State of Texas is immune from suit" under the Eleventh Amendment to the U.S. Constitution. ECF 30-1, at 21. To be clear, she does not suggest that the claims against *her* are barred by immunity. Her immunity argument is therefore improper. Neither Secretary Nelson nor the out-of-state private lawyers she has hired represent the State of Texas. By law, the Attorney General represents the State of Texas.[2] The only attorneys to appear on behalf of the State in this matter are thus from the Office of the Attorney General, and they have chosen not to assert sovereign immunity. *See* ECF 39 at 3 ("Texas does not raise the defense.").

The Secretary insists that dismissal is still required because, she suggests, sovereign immunity operates as a jurisdictional bar which the Court may address *sua sponte*. ECF 30-1 at 21-23 & n.2. But that is only partially correct. The Supreme Court has "noted that 'the Eleventh Amendment defense sufficiently partakes of the nature of a jurisdictional bar' that it may be raised by the State for the first time on appeal." *Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 515 n.19 (1982) (quoting *Edelman v. Jordan*, 415 U.S. 651, 678 (1974)). The Supreme Court, by contrast, has "*never* held that [sovereign immunity] is jurisdictional in the sense that it must be raised and decided by this Court on its own motion." *Id.* (emphasis added). That is because "Eleventh Amendment" immunity "does not automatically destroy original jurisdiction." *Wisc. Dep't of Corrs. v. Schacht*, 524 U.S. 381, 389 (1998). "Rather, [it] grants the State a legal power to assert a sovereign immunity defense *should it choose to do so*." *Id.* (emphasis added). Courts are therefore not required to "raise the [issue] on its own," and "can ignore it" where, as here, the State does not assert it. *Id.*

---

[2] In the General Appropriations Act, the Legislature commands that "the Attorney General shall have the primary duty of representing the State in the trial of civil cases" with exceptions not relevant here. S.B. 1, 89th Leg., R.S., at IX-76, § 16.01(a)(1) (May 21, 2025), https://perma.cc/7TBE-Q7G9.

The Secretary's attempt to raise sovereign immunity on behalf of the State is particularly mistaken in this case because the State of Texas has not only chosen not to assert the defense, but has instead affirmatively waived its immunity by "requesting that the Court enter a final judgment." ECF 27 at 2. As a general matter, "entering into a consent decree rather than asserting sovereign immunity in the initial suit usually waives any immunity against later enforcement of the decree." *Bergmann v. Mich. State Transp. Comm'n*, 665 F.3d 681, 683 (6th Cir. 2011) (Kethledge, J.) (citing *United States v. Gov't of Virgin Islands*, 363 F.3d 276, 288–89 (3d Cir. 2004)). This case follows *a fortiori*, as the Court is not presented with subsequent enforcement of a consent decree, only the initial entry of one.

Secretary Nelson fights this waiver, insisting that, as a matter of state law, the Attorney General's actions cannot waive sovereign immunity. *See* ECF 30-1 at 22-23 (citing decisions from Texas courts, a Texas statute, and briefs filed by the Attorney General). But that ignores the "rule of federal law that finds waiver through a state attorney general's invocation of federal-court jurisdiction." *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 612, 623 (2002). Whether the State has waived its immunity simply does not depend on state law. "[W]hether a particular set of state laws, rules, or activities amounts to a waiver of the State's Eleventh Amendment immunity is a question of federal law." *Lapides*, 535 U.S. at 623.

Secretary Nelson cites an earlier Fifth Circuit case to the contrary, *see* ECF 30-1 at 21 (citing *Magnolia Venture Cap. Corp. v. Prudential Sec., Inc.*, 151 F.3d 439, 443 (5th Cir. 1998)), but that decision relied on *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 467 (1945), which was overruled in *Lapides*, 535 U.S. at 623 ("Finding *Ford* inconsistent with the basic rationale of that line of cases, we consequently overrule *Ford* insofar as it would otherwise apply."); *see Meyers ex rel. Benzing v. Texas*, 410 F.3d 236, 246 (5th Cir. 2005) ("[I]n order to remove an impediment to its reaffirmation of the voluntary invocation principle, the Court substantially overruled its previous decision in *Ford*."); *Levy v. Off. of Legis. Auditor*, 362 F. Supp. 2d 729, 734 (M.D. La. 2005) (rejecting an argument based on *Magnolia Venture* and "not[ing] that the cases cited by the plaintiff were decided prior to *Lapides*").

## III. Plaintiffs Have Plausibly Pleaded That Texas's Open-Primary System Violates Their First Amendment Rights.

Political parties "enjoy a constitutionally protected right of political association," including the right to determine their own membership. *La Follette*, 450 U.S. at 121 (citation omitted). "In no area is [this] right to exclude more important than in the process of selecting its nominee[s]." *Jones*, 530 U.S. at 575. The Texas Election Code, however, requires the Party to select its candidates through an open-primary election in which non-Party members *can* vote, *have* voted, and *will* continue to vote in numbers that alter the outcome of primary elections and distort candidate messaging. *See* Compl. ¶¶ 28-56.

This is a "substantial intrusion into the associational freedom" of the Party and its members like Ms. Hunt that cannot be justified because Texas's open-primary system is not "narrowly tailored to serve a compelling state interest." *Jones*, 530 U.S. at 576, 582. Plaintiffs have accordingly alleged that the open-primary laws are unconstitutional as applied to them.

### A. The Election Code Imposes a Severe Burden on Plaintiffs' Associational Rights.

The First Amendment "protects the freedom to join together to further common political beliefs." *Id.* at 574. This "freedom to associate for the common advancement of political beliefs necessarily presupposes the freedom to identify the people who constitute the association, and to limit the association to those people only." *La Follette*, 450 U.S. at 122 (cleaned up). This right to identify the people who constitute an association is particularly important to political parties and "the process by which a political party selects a standard bearer who best represents the party's ideology and preferences." *Jones*, 530 U.S. at 575 (cleaned up).

Courts have accordingly and repeatedly held that "allowing nonparty members to participate in the selection of a party's nominee in conflict with the party's expressed desires constitutes a 'substantial intrusion into the associational freedom' of the party's members." *Ysursa*, 765 F. Supp. 2d at 1270 (citation omitted). The canonical case is *California Democratic Party v. Jones*. *Jones* addressed what is known as a blanket primary, a primary system in which each voter's ballot lists every candidate regardless of party affiliation and allows the voter to choose freely

among those candidates. 530 U.S. at 577. The Supreme Court held that this system violated the rights of the plaintiff political parties because those parties did not want to have unaffiliated individuals choose their parties' nominees. *Id.* at 581-82. The Court held that political parties cannot exercise their associational rights to choose their candidates through their own members if the state is "forc[ing] [them] to associate with—to have their nominees, and hence their positions, determined by—those who, at best, have refused to affiliate with the party, and, at worst, have expressly affiliated with a rival." *Id*. at 577.

Similarly, in *La Follette*, the Court held that Wisconsin's open-primary regime severely burdened the Democratic Party's associational rights by forcing the party to associate with non-Democratic voters. 450 U.S. at 123-24. Wisconsin required the parties to hold open primaries that permitted voters who were not affiliated with the Democratic Party to cast ballots in the Democratic Primary. *Id.* at 112. Wisconsin also required the Democratic Party's delegates—who were selected separately by the party—"to vote at the National Convention in accord with the results of the open-primary election," *id.*, even though this conflicted with Democratic Party rules stating that only those who "publicly declare their party preference and have that preference publicly recorded" should be allowed to participate, *id*. at 109. On these facts, the Court concluded that requiring the party to seat delegates selected in violation of party rules would impose a substantial burden on the party's associational freedom. *Id*. at 120-26. Indeed, the Court explained that, because "the inclusion of persons unaffiliated with a political party may seriously distort its collective decisions [and] impair[] the party's essential functions," political parties may "protect themselves from intrusion by those with adverse political principles." *Id*. at 122 (cleaned up).

Texas's open-primary system likewise substantially burdens the Party's associational rights by allowing non-Party members to participate in the Party's primaries despite the Party's rule excluding these voters. Texas's Election Code requires the Party to nominate candidates through an open-primary system that allows non-Republicans, including independent voters and Democrat voters, to vote in Republican primary elections. *See* Tex. Election Code §§ 162.002, 162.003, 162.012, 172.086, 172.125. As the Secretary concedes, all it takes for a registered voter to be able

to vote in the Republican Party primary according to Texas law is for that person to show up at their polling location and ask for a ballot so long as they have not already voted in another party's primary. ECF 30-1 at 24-25. *See also* Compl. ¶ 16 ("The Secretary tells the public that '[a] registered voter is not required to pre-register or take any steps towards affiliating themselves with a party before voting in a party's primary election.'").

This is in direct conflict with the Party's rules, which require voters to communicate their association with the Party by taking affirmative, non-expiring steps *before* showing up to vote in the primary. The permanent version of Rule 46 does this by restricting the Party's primary only to those voters who voted in the Party's primary during the last election cycle or else registered or submitted a written certificate of affiliation with the Party before the election. Compl. ¶ 61. The current, temporary version of Rule 46 does this by restricting the primary to those voters who are "registered to vote with the . . . Secretary of State as a Republican." *Id.* ¶ 63. But both versions are clear that simply showing up and asking for a Republican ballot is not sufficient for a voter to demonstrate to the Party's satisfaction that the voter is a Republican. Indeed, that is the entire point of Rule 46. Allowing voters to "affiliate" with the Republican party simply by voting in the Republican primary incentivizes crossover voting where Democrats and independents strategically vote in the Republican primary "to force the nomination of moderate candidates who they prefer or the nomination of weak candidates they believe will lose general elections." *Id.* ¶ 2; *see also id.* at ¶¶ 42-43. Requiring voters to associate with the Party beforehand and through a process that does not reset every election cycle disincentivizes this type of gamesmanship that can—and likely has—altered elections and Party candidate messaging in Texas. *Id.* ¶¶ 44-64.

Plaintiffs' claim accordingly falls easily within the ambit of *Jones* and *La Follette* because there, as here, a state law severely burdens a political party's associational rights by requiring it to allow non-party members to participate in selecting the party's nominees against its wishes. Indeed, a district court in Idaho, addressing a challenge to Idaho's similar primary law, applied those cases to hold that the primary law violated the Idaho Republican Party's associational rights. *See Ysursa*, 765 F. Supp. 2d at 1270. The Election Code is usurping the Party's First Amendment

right to control its membership and instead "forc[ing] [it] to adulterate [its] candidate-selection process . . . by opening it up to persons" with whom the Party does not want to associate. *Jones*, 530 U.S. at 581. That "obviously" affects the Party's ability to "determin[e] . . . [its] message." *Clingman v. Beaver*, 544 U.S. 581, 600 (2005) (O'Connor, J., concurring in part). There is "no heavier burden on a political party's associational freedom" than state laws that have the effect of "changing the parties' message" or altering even a "single" primary election. *Jones*, 530 U.S. at 579, 582.

Attempting to downplay the severity of the First Amendment burden and to cast the open primary as a mere minor inconvenience, Secretary Nelson makes three arguments. None has merit.

**1.** Secretary Nelson first argues that Texas law does not burden the Party's associational rights because it "does not open the Party's primary election to voters who lack an 'actual and express affiliation' with the Party." ECF 30-1 at 24. In her view, Texas law is not forcing the Party to associate with non-Republicans because anyone who votes in a Republican primary by law "affiliates" with the Party. *Id.*

But the Secretary does not get to choose who is a Republican—the Party does. And "a State, or a court, may not constitutionally substitute its own judgment for that of the Party." *La Follette*, 450 U.S. at 123-24. "A political party's choice among the various ways of determining the makeup of [its members] is protected by the Constitution. And as is true of all expressions of First Amendment freedoms, the courts may not interfere on the ground that they view a particular expression as unwise or irrational." *Id.* at 124; *see Jones*, 530 U.S. at 574 (explaining that the First Amendment gives the Party the right "to identify the people who constitute the association"). New Jersey does not get to decide what kind of conduct is consistent with the Boy Scout oath. *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 651 (2000). The City of Boston does not get to decide which groups "merit[] celebration" at a private St. Patrick's Day parade. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 574 (1995). And Texas does not get to decide the criteria for being a Republican. The Court should "give[] deference to the [Party's] assertions regarding

the nature of its expression." *Boy Scouts of Am.*, 530 U.S. at 641 (citing *La Follette*, 450 U.S. at 123-24).

None of the cases the Secretary relies upon are to the contrary. The Secretary cites *Tashjian* for the proposition that the Supreme Court "rejected the Party's premise that Texas forces [the Party] to include 'unaffiliated' voters in its primary election." ECF 30-1 at 26. But *Tashjian* merely noted in a footnote that Texas is one of among 16 States that "allow a voter previously unaffiliated with any party to vote in a primary if he affiliates with the party at the time of, or for the purpose of, voting in the primary." *Tashjian*, 479 U.S. at 222 n.11. It did not opine—and certainly did not hold—that state-defined affiliation at the time of voting somehow allows Texas to override the Party's judgment not to associate with voters who refuse to commit to the Party *before* entering the voting booth. *See id.* Quite the opposite. *Tashjian* made clear that a state burdens a political party's associational rights when it substitutes its associational judgment for the party's. *Id.* at 215. Of course, *Tashjian* involved a state law that sought to *limit* (not expand) the voters with whom a political party could associate for purposes of a primary election, but the principle is the same: When the state tries to dictate who a party must or must not associate with, it "infringe[s] upon the rights of the Party's members under the First Amendment to organize with like-minded citizens in support of common political goals." *Id.*

Secretary Nelson also cites *Clingman* for the proposition that the Supreme Court has "repeatedly affirmed that individuals can 'join a political party merely by asking for the appropriate ballot at the appropriate time.'" ECF 30-1 at 27 (quoting *Clingman*, 544 U.S. at 590 (plurality opinion)). Not so. In *Clingman*, the Oklahoma Libertarian party challenged a state law prohibiting voters from voting in the Libertarian party primary if they were already affiliated with another party and refused to disaffiliate. *Clingman*, 544 U.S. at 585. The Court rejected this challenge, explaining that "a voter who is unwilling to disaffiliate from another party to vote in the [Libertarian party's] primary forms little 'association' with the [Libertarian Party]—nor the [Libertarian Party] with him." *Id.* at 589. And as part of that analysis, the Court explained that disaffiliating with one party and reaffiliating with another under Oklahoma law was easy because

a voter could affiliate with a party merely by asking for a ballot. *Id.* at 590. The Court did *not* hold that—or even address whether—a state's decision to allow a voter to "affiliate" with a party by asking for a ballot could override a political party's decision not to associate with such a voter.

Finally, the Secretary attempts to distinguish *Jones* because it involved a blanket primary with no affiliation requirements whereas Texas law requires "voters [to] affiliate with a party." ECF 30-1 at 26. But while *Jones* itself addressed a blanket primary, its reasoning is substantially broader. *Jones*—following *La Follette*—made clear that political parties have the right to determine with whom they will associate to choose their nominees. *Jones*, 530 U.S. at 575-78. That is why courts have found *Jones* highly "instructive" in deciding disputes involving a conflict between party rules and state laws permitting open primaries, like that at issue here. *Ysursa*, 765 F. Supp. 2d at 1271.

**2.** Secretary Nelson's second argument is that Plaintiffs failed to "plausibly allege that the Election Code materially impairs its ability to shape its message and choose its standard bearers." ECF 30-1 at 28. This is nonsense. Plaintiffs have pled that crossover voting infects the Party's primaries and imposes a severe burden on the Party by changing its message. At this stage, a court must accept the Plaintiffs' "allegations as true and draw all reasonable inferences in [their] favor." *Boudreaux v. La. State Bar Ass'n*, 3 F.4th 748, 756 (5th Cir. 2021).

Plaintiffs plausibly allege that crossover voting infects Republican primaries in Texas. The Complaint defines crossover voting and provides academic and case law support for this "well-established strategic voting behavior." Compl. at 10; *see id.* ¶¶ 28-43. The Complaint lays out how crossover voting is particularly prevalent in "one-party" States and districts, like those in Texas. *See id.* ¶ 39. The allegations go on to explain how the Election Code's provisions combined with the political circumstances prevailing in Texas—including Republicans' domination of "elections and state offices for the past several decades" as well as the contested nature of Party primaries in the State—create conditions ripe for crossover voting. *Id.* ¶ 52; *see id.* ¶¶ 44-56. The Complaint then details how crossover voting has been "rampant in Texas," citing two examples from 2024, in which close vote margins and the candidates' political stances demonstrate Democrats' and

independents' effect on election outcomes. *Id.* ¶ 44, 47-48; *see also id.* ¶ 49 (alleging the Democratic party "encourage[s] Democrats to vote in Republican primaries").

Faulting Plaintiffs for mentioning the results of only two recent elections, the Secretary argues that Plaintiffs must allege more to demonstrate that "those outcomes are representative of primary elections in Texas." ECF 30-1 at 29. But the Supreme Court says otherwise. In *Jones*, it explained that even "a single election in which the party nominee is selected by nonparty members could be enough to destroy the party." *Jones*, 530 U.S. at 579 (rejecting the court of appeals' conclusion that because a state law allowed crossover voting "in only a small number of races," the burden imposed was "not severe"). Plaintiffs therefore only needed to allege sufficient facts to support the *possibility* that crossover voting *could* alter a single election in order to trigger strict scrutiny. Plaintiffs have done much more, alleging not only that crossover voting is likely to alter future elections, but that it has already dictated the results of past elections. *See* Compl. ¶¶ 47-48.[3]

Secretary Nelson's real disagreement with Plaintiffs' allegations seems to be that she just doesn't believe them. To her mind, Texas law already protects against crossover voting through provisions that bind voters temporarily to the Republican Party if they vote in the Republican primary. Specifically, she spends almost two pages of her brief explaining that individuals who vote in the Republican primary are publicly listed as having done so, may not vote in another party's primary during the same election cycle, and cannot participate in another political party's affairs that same election cycle. ECF 30-1 at 25-28 (citing, among other provisions, Tex. Election Code §§ 162.003-.008, 162.012, 162.014). But Plaintiffs have alleged that, despite these provisions, crossover voting by Democrats and independents is still "rampant." Compl. ¶¶ 44-56. This is unsurprising, as the supposed protections Secretary Nelson identifies are exceedingly minor

[3] That also distinguishes this case from *Democratic Party of Hawaii v. Nago*, where the party failed to allege that crossover voting had affected the outcome of any of its primary elections. *See generally* 833 F.3d 1119 (9th Cir. 2016). Indeed, the party there relied only on "an excerpt from its constitution" and allegations regarding the number of party members and asked the court to make leaping inferences that non-members were voting in its elections. *Id.* at 1124. Given Plaintiffs' specific allegations about crossover voting, including its effect on two recent elections, *Nago* is wholly different from this case.

and temporary. *See* ECF 30-1 at 24. The fact is, Secretary Nelson cannot and does not deny that, despite these asserted minimal protections, a Democrat who has "voted in every Democratic primary for the past five election cycles and who has not changed his political views may still vote in a Republican primary election simply by asking for a Republican ballot." Compl. ¶ 29. Thus, even under the Secretary's view, Texas's primary system allows "voters in sympathy" with other parties to "designate themselves as" Republican voters "so as to influence or determine the results of the [Party's] primary." *La Follette*, 450 U.S. at 122 (cleaned up) (explaining the constitutionality of state laws that require voters to enroll in a party well in advance of the primary election).

The Secretary's disbelief of Plaintiffs' allegations is nowhere clearer than in her argument faulting Plaintiffs for having failed to provide more "evidence" supporting their crossover voting allegations. ECF 30-1 at 28-29. But at this stage, Plaintiffs have no obligation to present evidence and may rely solely on their well-pled allegations. *See Boudreaux*, 3 F.4th at 756.[4]

**3.** The Secretary's final argument is that the Party has not demonstrated that closed primaries held pursuant to Rule 46 would eliminate these severe burdens. ECF 30-1 at 29-30. But that argument ignores Rule 46's requirements, which require voters to register *with the Party*, and thus imposes a harder choice than simply showing up and voting in the Party's primary on election day. *See supra* Part I.A. And the Secretary's citation to *Tashjian* on this point is wholly inapposite. ECF 30-1 at 30. There, the *party* sought to allow a broader swath of voters to participate in its primaries—not just party members—and the Court found a state-law restricting voting to registered members was not a compelling interest permitting the law to satisfy strict scrutiny. *Tashjian*, 479 U.S. at 219. This case is the exact opposite.

* * *

The Party has sufficiently alleged that the Election Code, as implemented and enforced by

[4] That the Supreme Court relied on evidence regarding California voters in *Jones* makes sense because that case reached the Court after a bench trial in which the district court "heard testimony over four days and . . . received numerous exhibits, including the reports of various experts." *Cal. Democratic Party v. Jones*, 984 F. Supp. 1288, 1292-93 (E.D. Cal. 1997).

Defendants, imposes a severe burden on its associational rights.[5] For that reason, the Election Code's primary provisions are subject to strict scrutiny. *See Jones*, 530 U.S. at 582.

### B. The Texas Election Code Does Not Survive Strict Scrutiny

The Texas Election Code provisions at issue here do not survive strict scrutiny because they are not narrowly tailored to a compelling state interest. Strict scrutiny is "the most demanding test known to constitutional law." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 484 (2025) (citation omitted). And the Supreme Court has "held only once" in the First Amendment context that "a law triggered but satisfied strict scrutiny." *Id.* "That case involved an unusual application of strict scrutiny, since [the Court's] analysis relied on the 'deference' due to the Executive's 'evaluation of the facts' in the context of 'national security and foreign affairs.'" *Id.* (citing *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33–34 (2010)). No such deference is due here.

The Secretary first argues that the challenged provisions promote the State's "interest in encouraging voter participation." ECF 30-1 at 31 (citation omitted). But the Supreme Court rejected "voter participation" as a compelling interest in *Jones*, explaining that "produc[ing] more voters" by allowing non-members to participate in a party's primary against its wishes is not a compelling interest and may not even be a "legitimate" interest. 530 U.S. at 584-85 (explaining that the voter participation interest "suffers from the same defect" as the State's alleged interest in "afforcing voters greater choice").[6] In any event, the Secretary provides no explanation as to *how* the current primary provisions advance the State's interest in voter participation. *See* ECF 30-1 at

---

[5] In any event, the cases on which the Secretary relies explain that "the severity of the burden that a primary system imposes on a party's associational rights is a factual issue," which the Court should not decide at this stage. *Nago*, 833 F.3d at 1123.

[6] The Secretary contends that *Jones*'s holding "does not control here" because of "material differences between . . . the structure of the primary elections and . . . the nature of the state interest being asserted." ECF 30-1 at 31 n.3. But as in *Jones*, Texas's primary system permits voters not affiliated with the Party (pursuant to Rule 46) to "adulterate [its] candidate-selection process." *Jones*, 530 U.S. at 581. There are therefore no "material differences" between *Jones* and this case. And the Secretary has provided no explanation how the "nature" of its voter-participation interest here is different from that asserted in *Jones*. There, California asserted its interest in producing more voters; Texas's interest is indistinguishable.

31 (citing cases explaining general voting rights principles). That is not the stuff of narrow tailoring.

The Secretary also contends that the State has a compelling interest in allowing new voters to participate in the Party's primary. ECF 30-1 at 31. But the Secretary provides no case law to support that this is a compelling interest. *See id.* And, in any event, the Texas Election Code is hardly "narrowly tailored" to that end. Texas does not, for example, limit its affiliation-by-voting approach to new voters.

The Secretary argues the State has a compelling interest in election integrity. ECF 30-1 at 32. The Secretary claims the primary provisions support that interest by "providing clear and administrable rules." *Id.* And she contends that if those provisions are struck down, that would undermine election integrity because that would "leave no plan for future elections." *Id.* The Secretary, however, ignores the as-applied nature of this challenge, meaning that the Election Code would remain enforceable against other parties in the State. More to the point, though, the Secretary makes no argument that the Texas Election Code is "narrowly tailored" to this alleged interest. *See id.* at 32. Nor could she, given that the registration procedures required by Rule 46 would provide just as clear guidance. Ex. A at 41. Further, the Secretary's argument exhibits little faith in the legislature's capability to pass new legislation implementing Rule 46. Indeed, after the court granted declaratory relief in *Ysursa*, the Idaho legislature promptly passed a new law complying with the party's associational rights. Compl. ¶ 5 & n.2. Nor does the Secretary credit the Party's allegations that it would implement its own system if the legislature failed to act. *See* Compl. ¶¶ 75-79.

Accordingly, the primary provisions of the Texas Election Code are unconstitutional as applied to the Party.

## CONCLUSION

This Court should deny Secretary Nelson's motion to dismiss.

Dated: November 26, 2025

Respectfully submitted,

/s/ *William T. Thompson*

William T. Thompson
Tex. Bar No. 24088531
Lehotsky Keller Cohn LLP
7500 Rialto Blvd, Suite 1-250
Austin, TX 78735
(512) 693-8350
will@lkcfirm.com

Mark M. Rothrock*
Lehotsky Keller Cohn LLP
8513 Caldbeck Drive
Raleigh, NC 27615

**Admitted pro hac vice*

C. Eric Vickers
Tex. Bar No. 24118577
Vickers Law Firm, LLC
600 S. Tyler St., Suite 2100
Amarillo, Texas 79101
Tel 806.414.0966
Fax 806.414.0966

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on November 26, 2025, and that all counsel of record were served by CM/ECF.

/s/ *William T. Thompson*
William T. Thompson