IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| CHIP HUNT; REPUBLICAN PARTY OF TEXAS,<br><br> *Plaintiffs*,<br><br>v.<br><br>STATE OF TEXAS; JANE NELSON, in her official capacity as Texas Secretary of State,<br><br> *Defendants*. | Case No. 2:25-cv-200 |

**DEFENDANT SECRETARY OF STATE JANE NELSON'S**
**REPLY IN SUPPORT OF THE MOTION TO DISMISS**

# ARGUMENT

The Secretary of State's motion to dismiss demonstrates that the plaintiffs have asked this Court to resolve a constitutional dispute that has not yet come into focus. *See* Dkt. 30-1 at 6-16 ("MTD"). The Party's opposition confirms as much. The Party admits that it has not yet decided what closed-primary rule it will use going forward (if any), and disclaims the need to set the details about how its closed-primary regime will operate (if at all), yet it nonetheless invites the Court to exercise its extraordinary authority to strike down duly enacted state laws. Article III does not tolerate such free-floating constitutional review. The Court should grant the motion to dismiss.

## I.     This Court Lacks Jurisdiction Over The Party's Lawsuit.

### A.     The Court Should Dismiss the Entire Action for Lack of Jurisdiction.

This dispute does not belong in federal court for two reasons: The Party lacks standing to challenge the open-primary law, and its challenge is not ripe for review. MTD 6-14.

**1.** The standing problem arises because the Party has not adopted a permanent closed-primary rule, making its alleged associational injury neither "ongoing" nor "imminent." *Machete Prods., LLC v. Page*, 809 F.3d 281, 288 (5th Cir. 2015); *see* MTD 7-11. The Party tries to avoid that conclusion by arguing that it will be injured one way or another, because the operative version of Rule 46 either will become permanent if "ratified by the convention" in 2026 or "will expire," in which case the Party will "revert to the prior, permanent version of Rule 46." Dkt. 41 at 8 ("Opp."). But whether the previous version would spring back to life is itself highly speculative, and in all events would not establish the only standing theory the Party asserted in its complaint.

To begin, the Party is not presently suffering any "ongoing" injury on account of the operative rule because that rule cannot be applied to any primary absent approval from the convention. MTD 7-9. The Party's alleged injury arises from an asserted "direct conflict" between state law and the operative rule. Compl. ¶¶82-86. But the Party concedes that the operative rule cannot presently govern any future primaries, because it is a "temporary" rule that will become permanent only "if ratified by the convention." Opp. 8. Because the Party did not have a closed-primary rule set to govern any primary when it filed its complaint—and still does not have one even now—it

1

does not presently have any associational injury to assert. *See Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 460 (5th Cir. 2005) (courts measure standing as of the day the complaint was filed).

That should suffice to end this premature dispute, as it is the square law of the Fifth Circuit that a party must actually have a permanent closed primary rule to establish standing to bring a challenge premised on one. *See Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 545-48 (5th Cir. 2008); MTD 9-10. The Party's efforts to distinguish *Barbour* fall flat. *Barbour* did not hold that the party there adequately alleged standing, *contra* Opp. 9; it instead applied the standard for pre-enforcement First Amendment challenges (which applies at the pleadings stage) and held that the political party had not satisfied it—because it had not yet adopted a permanent closed primary rule. *See* 529 F.3d at 545-48. That is exactly the problem here.

The Party tries to cure that defect by claiming that, if the temporary version of Rule 46 does not pass the convention, then the "prior, permanent version of Rule 46" will spring back to life and provide a *different* closed primary rule. Opp. 8. The Party did not make that claim in its complaint—likely because offering *two* hypothetical theories of how it *might* (but might not) be injured in the future would underscore the standing and ripeness problems with its lawsuit. At any rate, it does not fix the Party's problems. For one thing, that hypothetical injury is just as "speculative" and "remote" as the Party's attempt to premise injury on the temporary rule. *Damian v. Park*, 137 F.App'x 619, 620-21 (5th Cir. 2005) (per curiam). The Party's late-breaking reversion depends on a "chain of contingencies": (1) the convention must not ratify the operative rule at the convention, (2) the Party's internal rules must trigger an automatic reversion to the prior version of Rule 46, and (3) the Party must decide not to adopt (another) temporary rule prior to that automatic reversion. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). Though "[e]ach link in [that] chain of contingencies must be 'certainly impending' to confer standing," *Glass v. Paxton*, 900 F.3d 233, 239 (5th Cir. 2018), the Party's complaint does not allege that *any* will occur.

Consider each contingency in turn. First, whether the convention will ratify the operative rule at the 2026 convention is a question of fact, and the complaint offers no allegations on that question one way or another. Because the Party "fails to allege certainty as to how" the convention

2

"will exercise [its] future judgment," any "alleged harm" that turns on that question "is not certainly impending." *Id.* at 241.[1] Second, the Party's complaint does not allege that the prior version of Rule 46 would be revived if the current version is not ratified at the 2026 convention; that theory has instead been offered for the first time in its opposition. *See* Opp. 5&8; *but see Barilla v. City of Houston*, 13 F.4th 427, 431 (5th Cir. 2021) (requiring jurisdictional facts to be alleged in the complaint at the motion-to-dismiss stage). Even now, moreover, the Party has cited no rule or other authority supporting its claim that an emergency modification under Rule 1(c) would trigger automatic reversion upon expiration. That silence is telling because the Party's rules provide an explicit reversion mechanism elsewhere, yet contain no such clause for modifications under Rule 1(c). *Compare* Dkt. 30-2 at 4, *with* Rule 8(e), Dkt. 30-2 at 8 ("Failure to adopt Bylaws or Rules for the current biennium by a majority of those present and voting shall enact the previous biennium's Bylaws or Rules."). So, if anything, the stronger inference is that the Party did *not* intend the earlier version of the rule to return if the operative rule gets rejected by the convention. *See Wheeler v. Pilgrim's Pride Corp.*, 536 F.3d 455 (5th Cir. 2008). Third, and finally, the complaint says nothing about the Party's intent to let the earlier rule revive (if reversion would occur) rather than adopt another temporary modification.

In all events, even if facts supporting all of those contingencies had been adequately alleged in the complaint, the Party's reversion theory suffers from the additional problem that it does not map onto the basis for standing alleged in its complaint. The only associational harm alleged in the complaint is the purported conflict between Texas law and the temporary rule's requirement that "only *registered members* of the Republican Party may vote in the Republican primary." Compl. ¶¶1, 2, 5, 83, 84 (emphasis added). But that party-registration requirement appears only

---

[1] If the convention *does* ratify the current rule, that would not help the Party because "the court cannot rely on events that unfolded after the filing of the complaint to establish its standing." *Kitty Hawk Aircargo, Inc.*, 418 F.3d at 460. The complaint failed to allege that the Party would ratify the current rule, so as of the date of filing it was entirely speculative what form (if any) the Party's open primary rule would take. Indeed, the Party did not even disclose to the Court the current rule *is* "temporary" until forced to do so in response to the Secretary's motion.

in the "emergency and temporary" version of Rule 46. Opp. 8; *see* Dkt. 30-2 at 40. The earlier rule, by contrast, allowed voters to participate in the Party's primary even if they were not registered Republicans. *See* Dkt. 41-1 at 40. The only injury asserted in the complaint thus turns on a conflict that would not exist if the earlier rule were to spring back to life. For that reason too, the Party's attempt to pivot to a new standing theory in its opposition cannot cure the fatal defect in the complaint. *See Roebuck v. Dothan Sec., Inc.*, 515 F.App'x 275, 280 (5th Cir. 2013).

**2.** For many of the same reasons, this dispute is not ripe, both because the issues at the heart of it would benefit from "[f]urther factual development" and because the Party would not suffer hardship from delaying review. MTD 11-14. The Party's opposition—which cannot even say which version of Rule 46 will apply in 2027—only heightens the ripeness concerns.

The Party's threshold argument (at 10) that ripeness and standing necessarily rise and fall together flouts settled precedent. Both standing and ripeness implicate the Court's Article III jurisdiction, but they are different doctrines that require different inquiries that can dictate different results. *See Texas v. United States*, 497 F.3d 491, 496-500 (5th Cir. 2007). That those doctrines share some "overlap in practice" does not render them one and the same. *See id.*

Turning to the ripeness factors, the absence of any hardship from delaying review provides the most straightforward basis for dismissal. The Party does not dispute that the current version of Rule 46 will not "take effect" (if it ever does) until January 2027. Dkt. 30-2 at 40 ("rules on electoral affairs … take effect on January 1 of the odd-numbered year following" the convention); *see* MTD 7-8. That means the Party's 2026 primary election will follow existing rules no matter what happens in this lawsuit. Accordingly, the Party will not suffer any associational injury from postponing review until it becomes clear which version of the closed-primary rule (if any) will apply. Because the plaintiff must show *some* degree of hardship to establish ripeness, *Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 715 (5th Cir. 2012), the lack of hardship from delaying review until this dispute crystallizes provides an adequate basis to dismiss the case.[2]

---

[2] The Party claims that the "hardship from delayed review is … obvious" because it "must continue holding open primaries that violate its associational rights." Opp. 13. But that injury

The second factor—fitness for review—likewise supports dismissal. The fitness inquiry asks whether the claim would benefit from "further factual development." *Id*. Here, the answer is plainly "yes." The critical issue in this case—whether Texas's open-primary laws impose a severe burden on the Party's associational rights—"is a factual, not a legal, question." *Democratic Party of Haw. v. Nago*, 833 F.3d 1119, 1123 (9th Cir. 2016). Answering that question "depend[s] on facts not yet in existence." *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 833 F.2d 583, 588 (5th Cir. 1987). For starters, it remains to be seen which version of Rule 46 will apply during the pendency of this case: the current version, the earlier version, an entirely different version, or perhaps no version at all. That unresolved factual question matters because the existence of a closed-primary rule is a necessary predicate to the constitutional claim asserted here. *See Barbour*, 529 F.3d at 548. Next, it remains to be seen what form the closed-primary rule will take. That matters because the degree of the associational burden (modest or severe) changes the relevant standard of scrutiny (relaxed or strict), *see Clingman v. Beaver*, 544 U.S. 581, 591-92 (2005) (plurality op.), and the degree of the associational burden in turn depends on the nature of the conflict between the Party's closed-primary rule and state law, *see Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). The existence of these "open question[s]" makes this dispute unripe, *Liberty Mut. Ins. Co. v. La. Dep't of Ins.*, 62 F.3d 115, 117 (5th Cir. 1995), because it has not "taken on final shape," *Orix Credit All., Inc. v. Wolfe*, 212 F.3d 891, 898 (5th Cir. 2000).

Comparing the different versions of Rule 46 confirms the need for more factual development. The earlier version of Rule 46 allows Texans to vote in the Party's primary even if they submit only a certificate of affiliation. Dkt. 41-1 at 40. The current Rule 46 does not. Dkt. 30-2 at 40. The earlier version allows Texans to participate in the Party's primary if they voted in the "Republican Primary Election or the Republican Primary Runoff Election in the previous biennium." Dkt. 41-1 at 40. The current version does not. Dkt. 30-2 at 40. The earlier version allows

---

will not attach until 2028 at the earliest because that is the first primary where the Party's rule could apply. *See* Tex. Elec. Code §41.007(a) (specifying that general primary elections occur only in "even-numbered year[s]"); Compl. ¶ 4 (contemplating changes, at the earliest, "in 2028").

Texans to vote in the Party's primary without registering party affiliation if they are under 21 and it is their first primary election. Dkt. 41-1 at 40. The current version does not. Dkt. 30-2 at 40. The earlier version requires registration with *the Party*. Dkt. 41-1 at 40. The current version requires registration with *the Secretary*. Dkt. 30-2 at 40. All these differences affect the severity of the alleged associational injury and the burden that would be imposed on the Secretary to administer the party-registration regime. *See, e.g.*, *Staley v. Harris County*, 485 F.3d 305, 309 (5th Cir. 2007) (en banc) (finding a case unripe because "no decision has been made regarding any aspect of the future display of the [allegedly unlawful] monument" and thus the court was "unable to conduct the fact-intensive and context-specific analysis" required by the law).

More practically, the uncertainty about whether—and which version of—Rule 46 will apply in the future would complicate discovery and expert development. If the case moves beyond the pleadings stage, the Secretary will likely engage in discovery and retain experts to analyze (1) the degree of crossover voting under current law and (2) whether a closed primary would materially reduce crossover voting. But the Secretary cannot adequately tailor discovery requests or retain experts without knowing how the closed-primary regime will operate. Allowing the case to proceed in the face of that uncertainty would turn the freedom-of-association claim into a "moving target." *Wyoming v. Zinke*, 871 F.3d 1133, 1142 (10th Cir. 2017). Despite what the Party says (at 11), the bare fact that "implementation of the Party's rules [would] conflic[t]" with the open-primary regime does not dictate what degree of constitutional scrutiny applies. Strict scrutiny applies only if the associational burden is severe, *Clingman*, 544 U.S. at 592, and the severity of the burden cannot be identified when nobody knows how (if at all) a closed primary would operate.

### B. The State of Texas is Immune from Suit.

The State should be dismissed from this action because it is immune from suit. MTD 14-16. The Party quibbles about whether "sovereign immunity operates as a jurisdictional bar which the Court may address *sua sponte*." Opp. 14. But the Fifth Circuit has explained many times that sovereign immunity goes to a court's subject-matter jurisdiction. *See Carver v. Atwood*, 18 F.4th 494, 497 (5th Cir. 2021); *Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 333 n.8 (5th Cir.

6

2002); *Warnock v. Pecos County*, 88 F.3d 341, 343 (5th Cir. 1996). As such, it may be raised "sua sponte." *Perez*, 307 F.3d at 333 n.8. *Perez* says exactly that, *see* MTD 15 n.2, making the Party's failure to respond to that decision telling. In any event, that debate is beside the point: The Secretary is not asking the Court to inject an issue into this case *sua sponte*. Rather, the Party insists the Court should *ignore* immunity in the face of a state instrumentality pressing it.

The Party likewise has no response to the numerous authorities holding that the Attorney General lacks authority under state law to waive the State's sovereign immunity. MTD 14-15 (collecting authorities). The Party instead argues that whether "the State has waived its immunity" in federal court "does not depend on state law." Opp. 15. To borrow the Party's turn of phrase, that argument gets the law only "partially correct." Opp. 14. It is certainly true that whether the State's actions suffice to establish waiver is a question of federal waiver law. *See Lapides v. Bd. of Regents*, 535 U.S. 613, 623 (2002). But when a state official purports to waive the State's Eleventh Amendment immunity in federal court, both Supreme Court and Fifth Circuit precedent instruct courts to look at state law to determine whether the state official *has authority* to waive the State's immunity. *See Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 466-70 (1945); *Dagnall v. Gegenheimer*, 631 F.2d 1195, 1196 (5th Cir. 1980). And here, it is undisputed that the Attorney General lacks state-law authority to waive the State's sovereign immunity.

Accordingly, the only question left is whether the Court must accept the Attorney General's *ultra vires* attempt to waive the State's immunity. Invoking *Lapides*, the Party argues that the Attorney General effectuated a waiver despite lacking authority under state law to do so. Opp. 15 (citing 535 U.S. at 623). But *Lapides* did not involve a threshold objection to an unauthorized effort to waive sovereign immunity. It involved the very different situation of a state official removing a case to federal court, then trying to claim immunity from the very suit he asked the federal court to hear. The Court rejected that dubious effort, explaining that *Ford* does not permit a state official who voluntarily invoked federal jurisdiction to avoid the consequences of that waiver by arguing that he lacked authority to effectuate it. *See* 535 U.S. at 621-23. But *Lapides* went out of its way to confirm that "Eleventh Amendment waiver rules are different when a State's

7

federal-court participation is involuntary," and it did not purport to limit or overrule *Ford* as applied to such cases. *See id.* at 622-23; *Meyers ex rel. Benzing v. Texas*, 410 F.3d 236, 246 (5th Cir. 2005) (acknowledging *Ford* was only partially overruled). That is why the lack of state-law authority to waive immunity still matters, and why *Magnolia Venture Cap. Corp. v. Prudential Secs.*, 151 F.3d 439, 443 (5th Cir. 1998), remains good law in this context. MTD 14. And both *Ford* and *Magnolia* foreclose the Attorney General's impermissible waiver effort.

That the State sought to enter a consent decree does not alter that conclusion. While it might be true that "entering into a consent decree rather than asserting sovereign immunity in an initial suit usually waives any immunity against *later enforcement* of the decree," Opp. 15 (emphasis added), that does not address the question in this case, which is whether a federal court must accept an *ultra vires* waiver—over the objection of impacted state officials—in the first place. The Party has cited no cases to support that position, which is fatal to its argument. *Cf. St. Tammany Parish ex rel. Davis v. FEMA*, 556 F.3d 307, 315 (5th Cir. 2009) (holding that the plaintiff "bears the burden of showing" an "unequivocal waiver of sovereign immunity").

### C. Chip Hunt Lacks Standing to Bring a First Amendment Challenge.

Because Hunt lacks standing to assert the Party's associational injury, she should be dismissed from the suit even if the Court rejects the standing and ripeness arguments raised above. MTD 16. Hunt's only response is to cite a case that does not even address standing. *See* Opp. 8. Hunt thus fails to identify any reason why she should not be dismissed.

## II. The Complaint Fails To State A Claim.

### A. The Election Code Does Not Severely Burden the Party's Associational Rights.

**1.** Texas law does not severely burden the Party's associational rights because it requires meaningful affiliation with the Party before participating in the primary election. MTD 16-23. The Party's response misses the point. This dispute is not about who can join the Boy Scouts or march in a St. Patrick's Day parade. *See* Opp. 19 (citing *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 651 (2000), and *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 574 (1995)). It is about who can vote in elections. Because primary elections (unlike the Boy

Scouts and private parades) are state funded and involve state action, the Party does not have unfettered authority over who gets to participate in them. MTD 3; *see Smith v. Allwright*, 321 U.S. 649, 663-64 (1944). The Supreme Court acknowledged as much when it reaffirmed that a party's "right to limit its membership as it wishes" is "circumscribed … when the State gives the party a role in the election process"—as Texas did here "by giving [parties] the right to have their candidates appear with party endorsement on the general-election ballot." *N.Y. State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 203 (2008). Just this week, the Supreme Court of Texas reiterated the State's interest in regulating primary elections. *See In re Smith*, 2025 WL 3706698, *1-2 (Tex. Dec. 22, 2025) (per curiam). Accordingly, the proper question in this case is not whether Texas's open-primary laws burden the Party's associational rights *at all*, but whether the laws burden the Party's associational rights so severely as to warrant strict scrutiny.

On that question, the Party's opposition says very little. The central premise of the Party's complaint is that Texas forces the Party to associate with voters who lack an "actual and express" affiliation with the Party. MTD 17 (quoting Compl. ¶19). Yet the Party does not dispute that "voters *must* affiliate with a party to participate in that party's primary" or that "the State attaches meaningful consequences to a voter's decision to affiliate with one party to the exclusion of others." MTD 19. It brushes aside as dicta the Supreme Court's statement in *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 222 n.11 (1986), that Texas *does* require a voter to "affiliat[e] with the party" before voting in its primary election. *See* Opp. 20; *but see McRorey v. Garland*, 99 F.4th 831, 837 (5th Cir. 2024) (lower courts "are generally bound by Supreme Court dicta"). And it entirely ignores statements from the Supreme Court affirming that voting in a party's primary election to the exclusion of all others is "'an act of affiliation,'" MTD 20 (quoting *Cal. Democratic Party v. Jones*, 530 U.S. 567, 577 n.8 (2000)), that is "'at least as important as the act of registering' with a party," MTD 20 (quoting *Clingman v. Beaver*, 544 U.S. 581, 601 (2005) (O'Connor, J., concurring in part and dissenting in part)), meaning that "voters in Texas *are* 'put … to [the] hard choice'" of choosing their party, MTD 20 (quoting *Jones*, 530 U.S. at 584). Those undisputed authorities establish that any burden the current laws impose on the Party is not severe.

9

**2.** Even assuming that crossover voting happens to some degree, the Party failed to plausibly allege a severe associational burden because the complaint does not contain sufficient allegations to find that crossover voting "occurs with such frequency and intensity to 'seriously distort[] [the Party's] collective decisions.'" MTD 21 (quoting Compl. ¶85). That is a *pleading* deficiency—not a demand for additional evidence to bolster the veracity of the allegations.

**3.** Finally, the Party did not adequately allege that crossover voting under a closed primary system would be materially less than crossover voting under the current regime. MTD 22-23. That matters because, if crossover voting is unaffected by closing the primary, then the associational burden imposed by open-primary laws cannot be considered severe. *See id.* The Party responds that Rule 46 "require[s] voters to register *with the Party*" and "thus imposes a harder choice than simply showing up and voting in the Party's primary." Opp. 23. For starters, that is true only under the current version of Rule 46 (which cannot apply absent approval from the convention), not the earlier version, *compare* Dkt. 30-2 at 40, *with* Dkt. 41-1 at 40—which further underscores the ripeness problems underlying this dispute. Moreover, the Party offers nothing but its own say-so to support its claim that registering partisan affiliation presents "a harder choice" than the affiliation requirements that exist under current law, which (unlike merely registering partisan affiliation) prevent Texans from voting in other primary elections, Opp. 23, participating in the affairs of other parties, and running as an independent or as the nominee for another party in the next election, *see* MTD 17-18 (collecting authorities). The complaint does not allege that it is a harder choice, and until further details emerge about how partisan registration will work, it is virtually impossible for the court to make that assessment.

**B.     The Election Code Survives Constitutional Scrutiny.**

The Party does not dispute that the open-primary regime survives if relaxed scrutiny applies. *See* MTD 23-24. Because the challenged laws do not trigger strict scrutiny, they withstand review, and the complaint should be dismissed for failure to state a claim.

## CONCLUSION

The Court should grant the motion to dismiss.

Respectfully submitted,

/s/  *Erin E. Murphy*

**CLEMENT & MURPHY, PLLC**

Erin E. Murphy (*admitted pro hac vice*)
James Y. Xi (*admitted pro hac vice*)
Philip Hammersley (*admitted pro hac vice*)
706 Duke Street
Alexandria, Virginia 22314
Tel: (202) 742-8912
Fax: (703) 997-6207
erin.murphy@clementmurphy.com
james.xi@clementmurphy.com
philip.hammersley@clementmurphy.com

**UNDERWOOD LAW FIRM, P.C.**

Thomas C. Riney
State Bar No. 16935100
C. Jason Fenton
State Bar No. 24087505
P.O. Box 9158 (79105-9158)
500 S. Taylor, Suite 1200
Amarillo, TX  79101
Telephone: (806) 376-5613
Facsimile: (806) 379-0316
tom.riney@uwlaw.com
jason.fenton@uwlaw.com

*Counsel for Defendant Secretary of State Nelson*

## CERTIFICATE OF SERVICE

    I hereby certify that a copy of the foregoing was served upon all counsel of record on December 24, 2025, via the Court's CM/ECF system.

                                                                                      */s/ Erin E. Murphy*
                                                                                     Erin E. Murphy